**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

DRILON BERDYNAJ, individually, and on behalf of all others similarly situated,

Plaintiff,

- against -

THE CITY OF NEW YORK, YUME KITASEI in her individual capacity, LOUIS A. MOLINA in his individual capacity, JAKUB KAZIOR in his individual capacity, BELINDA FRENCH in her individual capacity, CYNTHIA POULTON in her individual capacity, and AWYMARIE RIOLLANO in her individual capacity,

Defendants.

**Case No. 1:26-cv-2126**

**AMENDED CLASS ACTION COMPLAINT**

**Jury Trial Demanded**

Plaintiff Drilon Berdynaj ("Plaintiff"), by and through his undersigned counsel, The Dugger Law Firm, PLLC, makes the following allegations against Defendants: (1) the City of New York ("Defendant City" or the "City"), (2) Yume Kitasei ("Kitasei" or "Defendant Kitasei") in her individual capacity, (3) Louis A. Molina ("Molina" or "Defendant Molina") in his individual capacity, (4) Jakub Kazior ("Kazior" or "Defendant Kazior") in his individual capacity, (5) Belinda French ("French" or "Defendant French") in her individual capacity, (6) Cynthia Poulton ("Poulton" or "Defendant Poulton") in her individual capacity, and (7) Awymarie Riollano ("Riollano" or "Defendant Riollano") in her individual capacity (collectively, "Defendants").

## INTRODUCTION

1. This action challenges the City's Department of Citywide Administrative Services' ("DCAS") use of categorical durational limits on disability accommodations, repeated demands for unnecessary additional medical documentation, and retaliation following remote-work disability accommodation requests.

2. Plaintiff brings this class action on behalf of all current employees of Defendant City, who made a request for a disability accommodation, other than for an accommodation of leave, and submitted a Reasonable Accommodation Request Form, and whose disability-based accommodation request was denied (or not approved) in writing, in whole or in part, within the applicable class period, because of the permanent, indefinite, and/or no end date nature of the disability, and/or the permanent, indefinite, and/or no end date nature of the requested accommodation (the **"Permanent Disability Denial Class"**).

3. Plaintiff brings this class action on behalf of all current DCAS employees who requested a disability-based remote work accommodation and submitted a Reasonable Accommodation Request Form, and within the applicable class period, received a demotion, denial of an interim accommodation pending their appeal, absent without official leave designation ("AWOL"), forced leave usage, and/or a notice of a Section 72 medical exam within seventy-five days after the request, renewal, supplement, or appeal of their disability-based remote work accommodation request (the "**Remote Work Request Retaliation Class**").

4. Plaintiff brings this class action on behalf of all current DCAS employees who made a disability accommodation request and submitted a Reasonable Accommodation Request Form, who had a permanent and/or long-term disability, who were initially approved for a disability accommodation, and then were, within the applicable class period, asked by Defendant City for additional medical documentation concerning the existence, diagnosis, severity, and/or continuing validity of the disability as a condition of continuing the accommodation (the "**Medical Inquiry Class**").

5. The above-defined classes are collectively referred to as the Classes.

6. The class period begins on March 16, 2023 for the Permanent Disability Denial Class and the Medical Inquiry Class and continues through the date of final judgment.

7. The class period begins on September 1, 2022, for the Remote Work Request Retaliation Class and continues through the date of final judgment.

8. On behalf of the proposed Classes, Plaintiff seeks class-wide declaratory and injunctive relief pursuant to Fed. R. Civ. P. 23(b)(2) requiring Defendant City to cease the challenged policies and practices and to implement lawful, individualized reasonable-accommodation and interactive-process procedures.

9. Plaintiff also brings claims on an individual basis against Defendants for: (1) disability discrimination, failure to provide reasonable accommodations, ineffective partial accommodations, disparate treatment based on disability, retaliation, failure to engage in a cooperative dialogue, interference with protected rights, and/or aiding abetting, in violation of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 ("Rehabilitation Act"), Americans with Disabilities Act of 1990 ("ADA"), as amended, 42 U.S.C. § 12101 *et seq.*, the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq*. ("NYSHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 *et seq*. ("NYCHRL"); and (2) interference with rights in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"). Plaintiff seeks individual monetary and equitable relief on his own behalf, including back pay, front pay, nominal damages, liquidated damages, restoration of leave and benefits, declaratory and injunctive relief (including an order requiring the grant of a remote accommodation in his role), attorneys' fees and costs, and such other relief as the Court deems just and proper.

10. DCAS, through its Citywide Equity and Inclusion ("CEI") office, serves as the City's central authority for citywide equal-employment-opportunity standards, including reasonable-accommodation policy, guidance, technical assistance, oversight, and training for agency EEO offices. Because City agencies look to DCAS for disability-accommodation guidance, DCAS's own accommodation practices have citywide significance.

11. DCAS's written guidance for the City (as an employer) requires a flexible, interactive, individualized process and states that there is "no one-size-fits-all approach" to reasonable-accommodation decisions.[1] The City's guidance treats accommodations as reasonable unless they "create an undue hardship or direct threat,"[2] and EEOC guidance requires individualized review rather than categorical denial of recurring or full-time telework accommodations.[3]

12. Nevertheless, DCAS applied the opposite approach to Plaintiff. In July 2024, French told Plaintiff that "[r]easonable [a]ccommodations are typically not permanent or indefinite," and DCAS denied his continued full-time remote-work accommodation because it

---

[1] *See* N.Y.C. Dep't of Citywide Admin. Servs.,*Reasonable Accommodation Procedural Guidelines City of New York 2024* at 6, 22 (July 2024) ("There is no one-size-fits-all approach for deciding when to grant a reasonable accommodation; rather, the reasonable accommodation process must be flexible, interactive, and individualized, . . ."), at https://www.nyc.gov/assets/dcas/downloads/pdf/agencies/reasonable_accommodation_procedural_guidelines.pdf (last visited June 12, 2026).

[2] *Id.* at 6.

[3] *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA, Notice No. 915.002* § "Undue Hardship Issues" (Oct. 17, 2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada (last visited June 12, 2026); *see also* U.S. Equal Emp. Opportunity Comm'n & Off. of Pers Mgmt. , *Frequently Asked Questions from the Federal Sector about Telework Accommodations for Disabilities* at Question 4 (Feb. 11, 2026), https://www.eeoc.gov/FAQ-federal-sector-telework-accommodations-disabilities (last visited June 12, 2026).

characterized the request as seeking remote work for an "indefinite period of time." DCAS thereby treated permanence, indefiniteness, or lack of an end date as a categorical bar and proxy for undue hardship instead of conducting the individualized inquiry required by law, the City's own written guidance issued by DCAS, and EEOC guidance.

13. Because DCAS is the central authority for the Defendant City on equal-employment-opportunity standards, its unlawful categorical bar and denial of disability-based reasonable accommodation requests based on permanence, indefiniteness, or lack of end date is one which Defendant City likely implements across City.

14. DCAS also repeatedly demanded additional medical information after already possessing documentation supporting Plaintiff's disability and need for remote work, including demands for an updated diagnosis or prognosis, a date by which Plaintiff could make a full return to work, and, after DCAS kept him out of work, a return-to-work note stating that he could return "full duty" or without restrictions.

15. Plaintiff has a permanent and/or long-term chronic respiratory illness and multiple pulmonary conditions that leave him markedly susceptible to pulmonary infection and at high risk for severe complications. His condition substantially limits breathing and respiratory function, is exacerbated by exertion and exposure to dust, allergens, and other environmental irritants, and requires four daily sessions of chest physiotherapy and nebulizer therapy, spaced no more than three hours apart, with recurring access to specialized respiratory treatment equipment maintained at his residence.

16. Beginning in May 2021 and repeatedly thereafter, Plaintiff provided Defendants with comprehensive medical documentation from treating physicians explaining his disability,

treatment regimen, functional limitations, and need for full-time remote work. Defendants have had actual knowledge of Plaintiff's disability and accommodation needs since at least May 2021.

17. Plaintiff's claims do not arise from an inability to work. Despite his chronic condition, Plaintiff can perform the essential functions of his DCAS position with remote work. His core duties include project-management support, interagency coordination, scheduling, tracking, managing multiple concurrent projects and stakeholders, and senior Project Executive oversight, strategy, and liaison work.

18. Those functions are performed primarily through computer-based work, meetings, and telephone or video communications, and they can be performed remotely without redistributing essential duties or imposing undue hardship. Consistent with prior accommodation terms, Plaintiff also can conduct discrete site visits in support of other project managers when necessary while performing the core functions of his job remotely.

19. The feasibility of Plaintiff's accommodation was proven in practice. Beginning in March 2020, as a result of the COVID pandemic, DCAS transitioned Plaintiff's unit's work to remote operations, the unit continued to meet operational needs, and Plaintiff performed successfully at home through April 2021, after which the then-Mayor ordered City employees to begin a phased return. In early May 2021, Plaintiff requested an accommodation to continue working from home full-time due to his medical condition. Although DCAS initially approved the accommodation in June 2021, DCAS thereafter repeatedly treated the accommodation as temporary, issued initial denials, demanded additional medical documentation, reassessed Plaintiff's continued need, and conditioned any continuation on repeated renewals.

20. DCAS then denied Plaintiff's continued full-time remote-work accommodation in September 2022 and repeatedly denied, delayed, or frustrated it thereafter, despite Plaintiff's years

of successful remote performance, the prior determination that his remote accommodation did not cause an undue hardship, his repeated medical submissions, no identified performance deficiencies and no meaningful change to Plaintiff's duties, and irrespective of DCAS's May 9, 2023 own finding that remote work with required site visits would not impose an undue hardship. Defendants also retaliated, discriminated against, and subjected him to a hostile work environment by demoting Plaintiff in September 2022 immediately after accommodation protected activity and moving him from higher-level Project Executive work into a Project Manager role with more site visits to support the later argument that site visits barred full-time remote work.

21. Even after the demotion, site visits remained relatively infrequent, and Plaintiff conducted all site visits requested of him. From 2022 through 2025, Plaintiff conducted approximately twenty-three site visits total: seven in 2022, two in 2023, eleven in 2024, and three in 2025, averaging approximately one site visit every two months. Excluding the outlier year of 2024, Plaintiff averaged approximately four site visits per year or one every three months.

22. After repeatedly denying Plaintiff's accommodation requests, DCAS escalated the harm by refusing interim remote work, forcing leave usage, designating or threatening AWOL, revoking telework, compelling a Section 72 medical examination, placing Plaintiff on involuntary FMLA or medical leave, rejecting valid medical notes, and conditioning his return on a "full duty" or "without restrictions." (i.e., a 100% healed policy).

23. This action challenges both the individual wrongs inflicted on Plaintiff and the broader City and DCAS practices his case exemplifies: categorical denial of accommodations based on perceived permanence or indefiniteness, failure to engage in a lawful individualized interactive process or cooperative dialogue, unnecessary medical-documentation demands, and retaliation against employees who seek disability-based remote-work accommodations.

24. Unless enjoined, those practices will continue to deny employees the accommodation, limited-medical-inquiry, and anti-retaliation rights to which they are entitled.

## JURISDICTION AND VENUE

25. This Court exercises jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 2617(a).

26. This Court exercises supplemental jurisdiction over Plaintiff's NYSHRL and NYCHRL claims pursuant to 28 U.S.C. § 1367(a), because those claims are so related to Plaintiff's federal claims that they form part of the same case or controversy.

27. Defendant City is subject to personal jurisdiction in New York.

28. Defendants French, Molina, Poulton, Riollano, Kazior, and Kitasei are each subject to personal jurisdiction in New York because each worked for DCAS and/or the City, participated in conduct occurring in New York, and/or participated in conduct having an impact within New York City.

29. DCAS is a municipal agency of the City with its principal place of business located in New York County, within the Southern District of New York.

30. Venue properly lies in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district. Defendant City maintains its principal office at 1 Centre Street, New York, New York 10007, and all relevant employment decisions and actions were made and taken by Defendants within this judicial district.

31. This Court is empowered to issue a declaratory judgment pursuant to 28 U.S.C. §§ 2201-2202.

32. This Court is empowered to issue injunctive relief pursuant to 29 U.S.C. § 2617(a)(1)(B) and 29 U.S.C. § 794a(a)(2).

33. All conditions precedent to filing this Amended Complaint have been fulfilled.

34. On or about August 23, 2024, Plaintiff filed an administrative complaint against Defendant City (DCAS) before the New York State Division of Human Rights ("NYSDHR") and a supplemental complaint on or about May 10, 2025, which were dual filed with the EEOC.

35. On May 8, 2026, NYSDHR issued a Determination and Order of Dismissal for Administrative Convenience for the reason of allowing Plaintiff to pursue his federal remedies in court where "all issues concerning the question of discrimination charged can be resolved"

36. On or about June 9, 2026, the EEOC issued Plaintiff a "Notice of [His] Right to Sue." Plaintiff's ADA claims are being brought in this Amended Complaint within 90 days of Plaintiff's receipt of the notice.

## PARTIES

**Plaintiff Drilon Berdynaj**

37. Plaintiff Drilon Berdynaj is an adult individual who resides in Yonkers, New York.

38. DCAS has employed Plaintiff from approximately September 2018 through the present.

39. At all times relevant to the Amended Complaint, Plaintiff had a disability within the meaning of the Rehabilitation Act, ADA, NYSHRL, and NYCHRL. Plaintiff suffers from a chronic respiratory illness and multiple pulmonary conditions, including chronic persistent asthma, immotile cilia syndrome and bronchiectasis, impacting his respiratory and immune systems and leaving him markedly susceptible to pulmonary infection and at high risk for severe complications.

40. At all times relevant to the Amended Complaint, Plaintiff's disability has substantially limited one or more major life activities, including respiratory function, breathing, and the ability to remain away from his treatment equipment for extended periods without disrupting his prescribed respiratory treatment regimen.

41. At all times relevant to the Amended Complaint, Plaintiff was a covered employee within the meaning of the Rehabilitation Act, ADA, NYSHRL, and NYCHRL as Plaintiff was employed by Defendants and performed work for Defendants.

42. At all times relevant to the Amended Complaint, Plaintiff was an FMLA-eligible employee pursuant to 29 U.S.C. § 2611(2)(A)-(B), because: (i) Plaintiff had been employed by Defendant City for at least twelve months preceding any FMLA-qualifying event; (ii) Plaintiff had worked at least 1,250 hours during the twelve-month period immediately preceding any FMLA-qualifying event; and (iii) the total number of employees of Defendant City was fifty or more employees within seventy-five miles of Plaintiff's worksite.

43. Beginning as of at least May 2021, and continuing through the present date, Plaintiff has continuously satisfied all eligibility requirements under 29 U.S.C. § 2611(2) to qualify as an FMLA-eligible employee.

44. Plaintiff had, and has, a "serious health condition" within the meaning of 29 U.S.C. § 2611(11) that requires "continuing treatment by a health care provider" for a chronic condition.

**Defendant City of New York**

45. Defendant City is a municipal entity created and authorized under the laws of the State of New York.

46. Defendant City 's DCAS is a municipal agency of the City with its principal office and worksite located at 1 Centre Street, New York, New York 10007, within the Southern District of New York.

47. DCAS serves as the City's central administrative services agency responsible for citywide personnel services, facilities management, procurement, and administrative support services.

48. DCAS promulgates the City's Equal Employment Opportunity Policy, disability accommodation procedures, and additional employment policies and guidelines.

49. At all times during Plaintiff's employment, Defendant City employed substantially more than fifteen employees throughout the City.

50. At all times relevant to the Amended Complaint, Defendant City has received, and currently receives, federal financial assistance.

51. The City Comptroller's Annual Comprehensive Financial Report reflects that the City received approximately $10 billion in total federal grants in fiscal year 2023, approximately $11 billion in total federal grants in fiscal year 2024, and approximately $9 billion in total federal grants in fiscal year 2025.[4]

52. At all times during Plaintiff's employment with Defendant City, Defendant City was an employer within the meaning of the Rehabilitation Act, ADA, NYSHRL, and NYCHRL.

53. At all times during Plaintiff's employment with Defendant City, Defendant City was an employer within the meaning of the FMLA, 29 U.S.C. § 2611(4)(A)(i), having fifty or

---

[4] *See* N.Y.C. Comptroller, *The City of New York Annual Comprehensive Financial Report of the Comptroller for the Fiscal Years Ended June 30, 2025 and 2024*, pt. III, General Fund Revenues and Other Financing Sources at 398 (2025).

more employees for each working day during each of twenty or more calendar weeks in the current calendar year or the preceding calendar year, within seventy-five miles of Plaintiff's worksite.

54. At all relevant times, the Defendant City operated, controlled, and was responsible for the policies, practices, customs, and procedures of its agencies and departments, including DCAS, and for the acts and omissions of its officers, employees, and agents acting within the scope of their employment and under color of state and local law.

**Defendant Yume Kitasei**

55. Defendant Yume Kitasei is, and at relevant times was, the Commissioner of DCAS, the agency head for DCAS, and a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

56. Defendant Kitasei is sued in her individual capacity.

57. As Commissioner of DCAS, Defendant Kitasei has, and at all relevant times had, authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City.

58. Defendant Kitasei served as the agency-head appeal authority for Plaintiff's 2026 reasonable-accommodation appeal.

**Defendant Louis A. Molina**

59. Defendant Louis A. Molina was, at relevant times, the Commissioner of DCAS, the agency head for DCAS, and a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

60. Defendant Molina is sued in his individual capacity.

61. Defendant Molina had authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City.

62. Defendant Molina served as the appeal authority for Plaintiff's reasonable-accommodation denials.

**Defendant Jakub Kazior**

63. Defendant Jakub Kazior is, and at relevant times was, an attorney and/or agency counsel in DCAS's Office of General Counsel, and was a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

64. Defendant Kazior is sued in his individual capacity.

65. As a DCAS attorney, Defendant Kazior has, and at relevant times had, authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City, including, the authority to pursue discipline or threaten termination.

66. Defendant Kazior participated, communicated, implemented, advanced, and/or ratified employment actions affecting Plaintiff.

**Defendant Belinda French**

67. Defendant Belinda French is, and at all relevant times was, the DCAS Diversity and EEO Officer, and upon information and belief, was a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

68. Defendant French is sued in her individual capacity.

69. Defendant French has, and at relevant times had, authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City.

70. Defendant French served as a principal DCAS official responsible for receiving, evaluating, processing, approving, denying, and/or implementing Plaintiff's disability-based reasonable accommodation requests.

**Defendant Cynthia Poulton**

71. Defendant Cynthia Poulton is, and at all relevant times was, a DCAS Executive Director and/or senior management official within DCAS's Design and Project Management and/or Real Estate Services operations, and was a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

72. Defendant Poulton is sued in her individual capacity.

73. Defendant Poulton has, and at relevant times had, authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City.

74. Upon information and belief, Defendant Poulton personally participated in evaluating, describing, changing, assigning, restricting, and/or communicating Plaintiff's job duties, project responsibilities, site-visit responsibilities, supervisory reporting structure, and telework status.

**Defendant Awymarie Riollano**

75. Defendant Awymarie Riollano is, and at relevant times was, a senior DCAS official, Chief Workplace Officer and/or other senior workplace-management official, and was a DCAS employee, agent, and person within the meaning of the NYSHRL and NYCHRL.

76. Defendant Riollano is sued in her individual capacity.

77. Defendant Riollano has, and at relevant times had, authority over, or the ability to impact, Plaintiff's compensation, terms, conditions, or privileges of employment with the City.

78. Defendant Riollano was within Plaintiff's senior management chain and had authority over, involvement in, or knowledge of decisions concerning Plaintiff's reporting structure, work assignments, telework status, and/or return-to-office requirements.

79. Among other conduct, upon information and belief, Defendant Riollano's involvement is reflected by communications indicating that Defendant Poulton and Defendant

Riollano jointly scheduled or planned a meeting concerning Plaintiff's reporting structure and telework revocation.

**Collective Individual Defendants**

80. Defendants Kitasei, Molina, Kazior, French, Poulton, and Riollano are collectively referred to as the Individual Defendants.

81. At all relevant times, each Individual Defendant was an employee, agent, and/or person within the meaning of the NYCHRL and NYSHRL.

82. The Individual Defendants each personally participated in, directed, approved, implemented, interfered with, aided, abetted, compelled, coerced, incited, and/or ratified one or more of the unlawful acts alleged herein.

83. At all relevant times, each Individual Defendant's conduct had an impact within New York City.

## FACTUAL ALLEGATIONS

**Plaintiff's Duties, Successful Remote Performance, and Initial Accommodation**

84. Since joining DCAS on or about September 3, 2018, Plaintiff has worked in Real Estate Services within the Design & Project Management unit ("D&PM unit") as an Associate Project Manager/Project Executive, including serving on the D&PM unit's senior management team prior to his demotion on September 15, 2022.

85. In 2020, Plaintiff became a permanent employee with the civil service title of Administrative Project Manager while retaining the same business office title of Project Executive.

86. In his pre-demotion role as a senior management team member, Plaintiff reported directly to DCAS executive leadership, specifically Defendant Riollano and subsequently Defendant Poulton.

87. Plaintiff's position as part of the senior management team required him to participate in strategic planning discussions, coordinate major projects across multiple divisions, communicate directly with executive leadership on high-level matters, and represent the D&PM unit in senior-level meetings and initiatives.

88. Plaintiff's job duties as Administrative Project Manager included: (i) digital collaboration with team members, contractors, and stakeholders through email, video conferencing, project management software, and other electronic communication tools; (ii) written communication, including preparing project documentation, reports, memoranda, and correspondence; (iii) project coordination, including planning, scheduling, tracking, and managing multiple concurrent projects; (iv) budget review and analysis; (v) vendor coordination and oversight; and (vi) occasional site visits to DCAS project locations to conduct field inspections and verify field conditions in support of other project managers when needed, although site visits were not a part of Plaintiff's formal tasks.

89. The original job posting for Plaintiff's role sought an Associate Project Manager L2 to serve as a Project Executive and described responsibilities that included executive leadership, customer relations, overseeing a portfolio of more than 400 projects, supporting special initiatives, preparing proposals, analyzing historical data, developing business strategy, serving as liaison with client agencies and high-level stakeholders, assisting with capital budget forecasting, and coordinating with regulatory entities.

90. Nothing in the job description prohibited remote work and none of the listed responsibilities required regular physical presence in a DCAS office.

91. The core and essential functions of Plaintiff's position, initially as an Associate Project Manager, and thereafter as an administrative Project Manager, centered on digital

collaboration, written communication, and project coordination, all of which could be performed remotely without requiring physical presence in a DCAS office.

92. Site visits were not originally an aspect of Plaintiff's duties and still only a minor and non-essential aspect of Plaintiff's duties after his tasks were amended. In each instance that a site visit was needed to back up other project managers on special projects when they did not have capacity, Plaintiff conducted the site visit, and no other team member has ever been forced to conduct a site visit for Plaintiff.

93. The overwhelming majority of Plaintiff's work hours were spent performing administrative, coordination, planning, reporting, communication, and project-management functions.

94. From March 2020 through approximately April 2021, all DCAS employees classified as "non-essential" worked remotely full-time pursuant to COVID-19 pandemic mandates issued by New York State and City authorities.

95. During this period of mandatory remote work, Plaintiff successfully performed all aspects of his job duties remotely, demonstrating that his position was well-suited for remote work and that remote work arrangements did not impair his ability to fulfill his responsibilities or contribute to DCAS's mission.

96. On or about May 3, 2021, then Mayor Bill de Blasio issued an order requiring City employees to begin a phased return to office work, with employees initially working from home four days per week and reporting to the office one day per week.

97. On or about May 10, 2021, Plaintiff submitted a formal request to DCAS's EEO office for a reasonable accommodation to continue working from home full-time due to his medical condition and disability.

98. Plaintiff's May 10, 2021 reasonable accommodation request included medical documentation from his treating physicians describing his respiratory condition, identifying his high risk for respiratory complications, explaining his need for home-based respiratory treatment equipment, detailing functional limitations caused by office attendance, commuting, prolonged mask use, and environmental triggers, and recommending full-time remote work as a necessary workplace accommodation.

99. Plaintiff's request stated in part: (1) "On the recommendation of my primary doctor and specialist I am being advised that due to my multiple respiratory issues I am extremely high risk for other respiratory issues and so it is required that I continue working remotely until what the full effect of damage to my lungs are understood due to having pneumonia and Covid"; (2) "I have successfully worked remotely as most other folks have without any interruptions or lack of productivity"; (3) "Because of my respiratory issues I need oxygen from a machine / nebulizer in order to help alleviate any respiratory attacks"; (4) "The required use of two masks for long periods of time would severely interfere with my treatment which would cause unforeseen situations that would require long hospitalized stays"; and (5) Plaintiff's High-Frequency Chest Wall Oscillation vest and nebulizer were owned and located at home and, as Plaintiff understood and communicated at the time, could not practically be removed from the home for daily routine workday use at the office.

100. In support of his reasonable-accommodation request, Plaintiff submitted a treating physician note documenting that he "suffers from chronic respiratory illness," including "severe double Pneumonia in January 2020," followed by ongoing breathing difficulty and chronic cough, and later COVID-related pneumonia requiring continued respiratory treatment, including nebulizer therapy and chest physiotherapy. The provider explained that Plaintiff's condition is

exacerbated by exertion and environmental triggers, including dust and allergens, and recommended that Plaintiff continue full-time remote work and "avoid travel to the office environment" to prevent worsening episodes of breathing difficulty.

101. Plaintiff's 2021 statement regarding the equipment described the practical reality of his treatment setup as a layperson, not a claim that the equipment was physically impossible to relocate under any circumstances. Later medical documentation described the same practical limitation more precisely, including that the equipment was non-portable for routine, recurring transport and that Plaintiff's prescribed treatment regimen required regular access to the equipment at approximately three-hour intervals throughout the day.

102. Plaintiff also submitted a separate treating-provider note stating that Plaintiff had "pneumonia x 2" and a long history of asthma, that he was "too high risk" to report in person, and that he should be permitted to work from home/remotely as a reasonable accommodation.

103. On or about June 1, 2021, DCAS's EEO office granted Plaintiff's reasonable accommodation request, approving full-time remote work as an accommodation for Plaintiff's disability.

104. Following DCAS's June 1, 2021 approval of his accommodation request, Plaintiff continued to work remotely full-time from his residence while other DCAS employees returned to partial in-office work.

105. On or about September 13, 2021, Mayor de Blasio subsequently ordered all City employees to return to the office five days per week, ending the hybrid work arrangement.

106. Following the September 13, 2021 citywide return-to-office order, Plaintiff continued to work remotely full-time under his previously approved reasonable accommodation.

**October 2021 Demand for Duplicative Medical Documentation and Initial Denial**

107. On or about October 5, 2021, DCAS's EEO office informed Plaintiff that it would not consider any extension of his remote-work accommodation unless he submitted "additional medical documentation" by a fixed deadline. EEO wrote that "in order to be considered for an extension . . . additional medical documentation will be required," and directed Plaintiff to submit, by October 22, 2021, "a detailed medical note" including clinical findings addressing the "severity" of his condition, his current "limitations," his "treatment," whether the condition is "controlled," and an explanation for "why the nature of [his] condition and its associated symptoms, permits [him] to travel to site visits but not travel to the office."

108. This request was duplicative and unnecessary. DCAS already received medical documentation supporting Plaintiff's need for remote work and had been administering that accommodation. The request required Plaintiff to re-prove limitations DCAS was already relying on and sought expanded medical detail beyond what was needed to assess Plaintiff's continued ability to perform the essential functions of his job remotely.

109. On or about October 25, 2021, in response to DCAS's demand, Plaintiff submitted a request to extend his reasonable accommodation for continued full-time remote work. His request sought permission to "continue teleworking full-time," notwithstanding the City's September 13, 2021, full-time return-to-worksite directive, and to extend remote work beyond the then-expiring accommodation period.

110. The supporting medical certifications reiterated and updated the same disability-related facts DCAS already had on file: that Plaintiff suffers from a chronic respiratory illness with a history of pneumonia, including COVID-19 pneumonia; ongoing breathing impairment, including trouble breathing and chronic cough; and ongoing treatment needs, including use of a

nebulizer and chest PT device; that his breathing worsens with exertion and exposure to dust/allergens; and that his treating providers recommended he "continue working remotely" and "avoid travel to the office environment," including a recommendation that he continue working remotely through at least December 31, 2021.

111. In further support, Plaintiff provided a Westmed letter stating that he "suffers from multiple pulmonary issues" placing him at "markedly high risk for hospitalization *and death*" (emphasis added) given the then-current COVID-19 Delta variant and breakthrough infections despite vaccination, and requesting that he be "afforded accommodation to work remotely for the near future" due to frequent exacerbations of his underlying pulmonary disease.

112. Later the same day, however, DCAS's EEO office initially denied Plaintiff's request for an extension of his reasonable accommodation, stating: (1) "Based on the information provided, this Office is unable at this time to find that you have a medical condition that warrants the accommodation requested"; (2) "the additional information provided did not describe, in clinical terms, the nature and severity of your condition and its limitations"; and (3) the submission did not "establish, based on clinical evidence, that you are at a significantly high risk for severe illness or death from COVID-19."

113. Following DCAS's October 25, 2021 denial, which put his life at risk, Plaintiff provided yet additional documentation at DCAS's request and continued communicating with the EEO office regarding the ongoing medical necessity of continued full-time remote work. DCAS's requested post-denial submission was unnecessary because DCAS already had multiple medical document submission on file with DCAS establishing his disability and medical need for an accommodation. Plaintiff was allowed to continue working while his appeal was pending.

**DCAS Reverses the October 2021 Denial and Reapproves Full-Time Remote Work**

114. On or about November 17, 2021, DCAS reversed its October 25, 2021 denial and approved Plaintiff's request to continue working remotely full-time, stating: "Based upon the additional information provided, we have determined that an accommodation is warranted and can be granted at this time. We have also concluded that you are able to perform your essential duties remotely and that at this time, providing you with a temporary accommodation to telework full-time would not impose an undue hardship on DCAS."

115. Following DCAS's appeal determination, Plaintiff continued to work remotely full-time and successfully perform all of his job duties throughout late 2021 and into 2022.

**August-September 2022 Reassessment and Denial of Continued Full-Time Remote Work**

116. On or about August 23, 2022, DCAS EEO office emailed Plaintiff notifying him that it was conducting a review and reassessment of his ongoing medical need for the full-time remote accommodation. The email continued a pattern of accommodation denials, retaliatory actions, illegal medical inquiries, and discriminatory treatment that intensified over the subsequent three years, from August 2022 through the present.

117. At the time DCAS initiated its August 23, 2022 reassessment, Plaintiff had been successfully working remotely full-time under his approved reasonable accommodation continuously since May 10, 2021 -- a period of approximately fifteen months. He performed all his duties while working remotely, without performance deficiencies, warnings, discipline, or communications indicating that his remote accommodation was burdening DCAS's operations.

118. DCAS provided Plaintiff with no substantive reason for the reassessment.

119. Plaintiff's prior medical documentation established that his condition was permanent or long-term, and under EEOC guidance, the existence of the disability itself was not subject to reassessment.[5]

120. On or about September 12, 2022, following its purported reassessment, the DCAS EEO office formally denied Plaintiff's request to continue his accommodation stating:

> The EEO Office completed its review and has concluded that at this time, the agency does not have a justifiable basis to further extend your accommodation to work remotely and that extending your accommodation for an indefinite period of time is an undue burden to the agency's operations. Based on this determination, you are expected to report to the office within two weeks or sooner, on or before Monday, September 26, 2022.

121. DCAS's stated "justifiable basis" standard had no legal basis in disability-accommodation law. DCAS -- the agency responsible for training other agencies and creating citywide EEO policies regarding accommodations -- used a made-up "justifiable basis" legal standard.

122. The applicable "undue hardship" standard was not met by DCAS.

123. DCAS's denial email: (i) did not address or identify any specific "undue hardship" to continuing Plaintiff's accommodation; (ii) did not identify any change to Plaintiff's role or duties that created a new basis for undue hardship, nor was there any such change; (iii) did not offer any alternative accommodation; (iv) only gave Plaintiff fourteen days' notice before terminating his accommodation that had been successfully in place for approximately sixteen months; and (v) failed to comply with interactive process or cooperative dialogue requirements

---

5 *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Disability-Related Inquiries and Medical Examinations of Employees Under the Americans with Disabilities Act*, Question 11, n.54 (July 26, 2000), https://www.eeoc.gov/laws/guidance/enforcement-guidance-disability-related-inquiries-and-medical-examinations-employees (last visited June 12, 2026); *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA, Notice No. 915.*002, Question 8, Example A, Example B (Oct. 17, 2002),

because it was a conclusory termination of the accommodation dialogue, not a documented, good-faith exchange aimed at identifying an effective accommodation.

124. DCAS's justification for the September 12, 2022 denial -- that continuing Plaintiff's remote-work accommodation for an "indefinite period of time" would constitute an "undue hardship to the agency's operations" -- was retaliatory, pretextual, discriminatory, and a failure to accommodate.

125. The Rehabilitation Act, ADA, NYSHRL, and NYCHRL did not impose a categorical bar on long-term or indefinite accommodations.

126. The Rehabilitation Act, ADA, NYSHRL, and NYCHRL do not permit denying disability accommodations based on the permanent or indefinite nature of the disability and/or the permanent or indefinite nature of the disability accommodation.

127. DCAS did not engage in any meaningful interactive process or cooperative dialogue with Plaintiff in connection with its September 12, 2022 denial and did not discuss alternative accommodations, explore modifications to the existing accommodation, or engage in good-faith dialogue regarding Plaintiff's accommodation needs.

128. On or about September 14, 2022, two days after receiving the September 12, 2022 denial notice, Plaintiff submitted a new request for a reasonable accommodation to continue working remotely full-time and provided additional medical documentation. This request constituted protected activity under the Rehabilitation Act, ADA, NYSHRL and NYCHRL.

**September 2022 Demotion Following Plaintiff's Renewed Accommodation Request**

129. On or about September 15, 2022, <u>one day</u> after Plaintiff submitted his September 14, 2022 reasonable accommodation request, and three days after DCAS issued its September 12, 2022 denial, DCAS <u>demoted</u> Plaintiff in retaliation for his protected activity and/or as a result of

further disability discrimination. This demotion also subjected Plaintiff to a hostile work environment.

130. On the morning of September 15, 2022, Poulton sent Plaintiff an email containing a list of new anticipated tasks and standards and advised that she would discuss them during a September 16, 2022 telephone call. Through Poulton's September 15 email and the subsequent September 16 call with Poulton and Riollano, Plaintiff was informed that he was being removed from DCAS's senior management team, effective immediately.

131. Before September 15, 2022, Plaintiff served on the senior management team, reported directly to Riollano and later Poulton, and participated in strategic planning discussions, senior leadership meetings, and executive-level communications and initiatives. The demotion removed Plaintiff from the senior management team, and reassigned him to report to Director Stephanie Murrill in a subordinate Project Manager role.

132. DCAS provided Plaintiff with no advance notice of the demotion, no opportunity to respond, no explanation of any legitimate business justification, and no indication that his performance or conduct was deficient. Before the demotion, Plaintiff had received no warnings, counseling, progressive discipline, or indication that DCAS was contemplating adverse action.

133. The temporal proximity between Plaintiff's September 14, 2022 accommodation request and the September 15, 2022 demotion, and between DCAS's September 12, 2022 accommodation denial and the demotion, supports a causal connection between Plaintiff's protected activity and the adverse action.

134. The demotion resulted in multiple adverse changes to Plaintiff's employment, including: (i) removal from the senior management team; (ii) exclusion from senior leadership meetings and strategic planning sessions; (iii) reduction in supervisory level from reporting to an

Executive Director to reporting to a mid-level Director; (iv) diminishment of responsibilities and authority; (v) changes to job duties and assignments; and (vi) loss of senior management status and standing.

135. In addition, the demotion intentionally placed Plaintiff into a role in which site visits played a bigger role in his work, in an attempt to circumvent his pre-existing disability-based remote accommodation and/or retaliate against him for his prior disability-based remote accommodation or remote accommodation requests. The demotion was also a part of a hostile work environment.

**DCAS Posts a Replacement for Plaintiff's Former Senior Management Role**

136. During September 2022, contemporaneously with its demotion of Plaintiff, DCAS posted a new job opening within the D&PM unit advertising a position that would replace the senior management role from which DCAS removed Plaintiff.[6]

137. The job posting publicized in September 2022 was for Job Number 541552, Business Title "Program Executive," Civil Service Title "Administrative City Planner," Title Code 10053, Level M2, Division/Work Unit "Res/Design & Project Mgmt." This job posting was substantially similar to Plaintiff's pre-demotion senior management role, with comparable responsibilities, reporting structure, and management level.

138. On or about September 23, 2022, the DCAS EEO Office emailed Plaintiff regarding his September 14, 2022 reasonable accommodation request, which stated that it had asked Poulton to provide information regarding: (i) the projects, locations, and site surveys that had been assigned to Plaintiff during his accommodation period from May 2021 through September 2022; and (ii) the projects that Poulton expected to assign to Plaintiff going forward. The email further approved

[6] The new role, while substantively the same, was listed as managerial for civil service purposes.

Plaintiff continue teleworking in the interim until the EEO office made a determination on his September 14, 2022 accommodation request.

**April-May 2023 Conditional Approval and Written Finding of No Undue Hardship**

139. On or about April 19, 2023, approximately seven months after DCAS demoted Plaintiff in September 2022, the DCAS EEO approved Plaintiff's reasonable accommodation request but for only a *limited thirty-day period*. Moreover, this approval was explicitly conditioned upon Plaintiff, yet again, submitting additional - duplicative -- medical documentation in support of his request.

140. In her email, French characterized Plaintiff's request as to "work remotely full time for an indefinite period of time," asserted that the "medical documentation provided to date does not specify a clinical basis for the self-reported limitations," and stated that continuing Plaintiff's "preferred work arrangement" would be an "undue burden." French then demanded new physician documentation describing Plaintiff's current functional limitations and why full-time remote work was "medically warranted," including an explanation of how Plaintiff could attend "required site visits" but could not "travel to or work in an office environment," and further required the physician to detail Plaintiff's treatment schedule and provide a "date certain" by which Plaintiff could return to the office. French directed that the documentation be provided by May 19, 2023.

141. On or about April 24, 2023, just five days after receiving the thirty-day conditional April 19 approval, Plaintiff submitted additional medical documentation and information as requested by the EEO.

142. On or about May 5, 2023, Riollano issued a memorandum titled, "Renewal Options– Walk-through Protocols," stating that D&PM personnel would conduct walk-throughs only in narrow circumstances involving life-and-safety issues or certain compliance

responsibilities, and that in all other cases the client agency would continue monitoring the premises. The memo showed that in-person walk-throughs were not a routine baseline requirement of Plaintiff's job.

143. On or about May 9, 2023, following its review of the additional medical documentation and information Plaintiff submitted on April 24, 2023, the DCAS EEO issued a formal approval of Plaintiff's reasonable accommodation request to continue working remotely full-time. The approval letter contained express, written language acknowledging and confirming that Plaintiff's remote work accommodation (while still making site visits as he continued to do) did not impose an "undue hardship" to the agency:

> On April 19, 2023, the EEO office requested documentation from your medical provider that explains: (1) the functional limitations of your condition and how such limitations permit you to conduct your site visits as required but not report to the office; and (2) your prescribed treatment schedule and a date certain by *which such treatment will enable you to return to the office*.
>
> On April 24, 2023, you provided a medical note stating that you are being treated for chronic persistent asthma, immotile cilia syndrome and bronchiectasis and that your respiratory symptoms are triggered when exposed to environmental factors, such as cold, dust, and exertion. Your physician further stated that the symptoms of your condition include chronic dyspnea and coughing, for which you use a nebulizer treatment three times per day.
>
> In your cooperative dialogue with the EEO office, you explained that due to the potential triggers and symptoms of your condition, as well as treatment methods performed at home, you avoid crowds and try to be no more than one to two hours away from home. You also explained that at times, you may cough frequently due to your condition, which the EEO office observed in conversation with you.
>
> As an Administrative Project Manager for Real Estate Services, your essential duties include managing projects in leased and City-owned space, preparing and developing site evaluation reports and site surveys, preparation and review of preliminary plans and scopes of work, assisting with the review of documentation required for lease negotiations, lease renewals, lease registrations, budget and

> procurement, and performing other administrative duties related to construction projects when assigned. You explained that during the accommodation period, you have been coordinating and attending site visits for your assigned projects when required to do so, and that any corresponding administrative work has been performed remotely.
>
> Based on the information provided and our cooperative dialogue with you, the EEO office has conducted its review and concluded that extending your accommodation to work remotely, *with the exception of site evaluations and surveys related to your assigned projects, would not impose an undue hardship on DCAS at this time and can be granted*.
>
> Your temporary accommodation to work remotely, with the exception of required site visits, has been extended for three months and will be subject to renewal upon application. The EEO office *will check in with you on or around August 1, 2023, to assess the ongoing medical need for the accommodation and its effectiveness at that time*.
>
> Please note that once an accommodation is deemed effective and is implemented, the duration of that accommodation *may be continuous or temporary*. If an accommodation no longer meets the disability-related need or begins to pose a hardship to the agency, the EEO Office is obligated to engage in a cooperative dialogue and explore alternative options that might be effective without causing an undue hardship.
>
> If you have questions or would like to schedule a time to discuss further, please contact me.
>
> (emphasis added).

144. During that period, Plaintiff continued to successfully work remotely full-time from and received no warnings, counseling, performance deficiencies, discipline, or communications that his remote arrangement was causing operational difficulty.

**The 2023 Telework Pilot and Confirms the Feasibility of Plaintiff's Remote Work**

145. On or about July 31, 2023, DCAS implemented a new citywide telework pilot program that had been negotiated between the City and Plaintiff's union. Under the program,

DCAS employees whose job titles and positions were deemed suitable for teleworking were permitted to work remotely two days per week (Monday and Thursday, or Tuesday and Friday) and were required to report to the office three days per week (Tuesday, Wednesday, and Friday, or Monday, Wednesday, and Thursday).

146. The telework pilot program applied to employees throughout DCAS, including Plaintiff and other employees in Plaintiff's D&PM unit, and demonstrated DCAS's operational capacity to accommodate substantial remote work arrangements without operational hardship. However, the telework pilot program guidance stated in a July 31, 2023 email, that the policy did not apply to employees working with a reasonable accommodation: "This would not apply to someone who has a reasonable accommodation."

147. Thus, the presumptive *floor* for all employees, including the non-disabled employees was that they could work remotely at least two days a week, leaving the scope of requests for additional remote work, and any alleged undue hardship from such policy modification, as relevant only to the difference between two days remote and five days a week -- *i.e.*, a difference of three additional days of remote work.

148. After the telework pilot began, Plaintiff continued working fully remote under his approved accommodation while other DCAS employees participated in two-days-per-week telework, meaning Plaintiff's accommodation involved only three additional remote days beyond those provided to non-disabled employees and further undercut any claim of undue hardship.

149. Plaintiff continued to maintain satisfactory performance while working remotely during and after the telework pilot, including through July 31, 2024.

150. Throughout that period, Plaintiff successfully performed his core job responsibilities of digital collaboration, written communication, project coordination, budget review, and vendor oversight while working remotely.

151. DCAS's later contention that Plaintiff's role required frequent on-site work is inconsistent with the documentary record. The record reflects only a limited number of documented site visits from 2022 through July 2024 relative to Plaintiff's overall project workload, and DCAS's own May 5, 2023 memo limited when D&PM would perform renewal- option walk-throughs.

**July 2024: DCAS Announces a Position Against "Permanent" or "Indefinite" Accommodations**

152. On or about July 2, 2024, approximately fourteen months after DCAS's May 9, 2023 approval acknowledging "no undue hardship," French of the DCAS EEO office contacted Plaintiff to discuss the ongoing necessity of his reasonable accommodation. During this communication, French stated to Plaintiff: "reasonable accommodations are typically not permanent or indefinite."

153. French's July 2 statement, reiterated again on July 5, together with the subsequent denial of Plaintiff's request because it would continue for an "indefinite period of time," support the inference that DCAS was applying a categorical presumption against long-term telework accommodations rather than conducting an individualized assessment.

**DCAS Denies the Request Based on Its "Indefinite Accommodation" Rationale**

154. On or about July 31, 2024, after the July 2 and July 5 communications, the DCAS EEO office issued a formal denial of Plaintiff's reasonable accommodation request to continue working remotely full-time based on the characterization of his request as permanent. The denial notice stated: "You were notified that extending your accommodation for an indefinite period of

time would be an undue burden to the agency's operations." It also stated: "Based on the foregoing reasons, your request to continue your current accommodation to work remotely full-time for an indefinite period of time is denied, and you are expected to return to the office."

155. DCAS identified no change in Plaintiff's condition, job duties, or agency operations between May 9, 2023 and July 31, 2024.

156. DCAS's implicit position that even a single additional day or month, or months of accommodation, would necessarily result in an undue hardship, was not based on any actual concrete undue hardship having actually accrued.

157. Reliance on the future accrual of an undue hardship, accruing at some future point in time based on an unrealized burden, as opposed to an actual and present burden violated the Rehabilitation Act, ADA, NYSHRL, and/or NYCHRL.[7]

158. The across-the-board prohibition on "permanent" or "indeterminate" is akin to the prohibitions on 100% fully healed policies that EEOC Guidance explicitly prohibits.[8]

159. Plaintiff's medical condition and treatment requirements and essential job functions remained unchanged between May 9, 2023 and July 31, 2024, and DCAS identified no change in

---

[7] *See* U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance on Reasonable Accommodation and Undue Hardship Under the ADA, Notice No. 915.*002,§ Undue Hardship Issues, Question 13 (Oct. 17, 2002), https://www.eeoc.gov/laws/guidance/enforcement-guidance-reasonable-accommodation-and-undue-hardship-under-ada (last visited June 12, 2026).

[8] *See* U.S. Equal Emp. Opportunity Comm'n, *Employer-Provided Leave and the Americans with Disabilities Act* § Return to Work and Reasonable Accommodation (Including Reassignment): 100% Healed Policies (May 9, 2016), https://www.eeoc.gov/laws/guidance/employer-provided-leave-and-americans-disabilities-act (last visited June 12, 2026); U.S. Equal Emp. Opportunity Comm'n, Disability Discrimination and Reasonable Accommodation: Medical Inquiries, Leave and Telework § Leave as an Accommodation (Nov. 2021), https://www.eeoc.gov/laws/guidance/employer-provided-leave-and-americans-disabilities-act (last visited June 12, 2026); U.S. Equal Emp. Opportunity Comm'n, *Enforcement Guidance: Workers' Compensation and the ADA, EEOC Notice No. 915.002* ¶ 13 (Sept. 3, 1996), https://www.eeoc.gov/laws/guidance/enforcement-guidance-workers-compensation-and-ada (last visited June 12, 2026).

circumstances between that period that would justify its reversal of position regarding whether Plaintiff's remote work imposed undue hardship.

160. DCAS's operational capabilities, technological infrastructure, and ability to accommodate remote work remained unchanged (indeed, improved) between May 2023 and July 2024, as evidenced by the continued operation of the telework pilot program.

161. Plaintiff's work performance remained satisfactory and unchanged between May 2023 and July 2024, with no performance deficiencies, warnings, or concerns communicated to Plaintiff during this period.

162. The only relevant change between May 2023 and July 2024 was the *passage of time* and Plaintiff's continued need for permanent accommodation -- factors that under the ADA, Rehabilitation Act, NYSHRL, and NYCHRL cannot constitute legitimate bases for denying a reasonable accommodation.

163. The passage of time alone is not an undue hardship. DCAS identified no concrete hardship arising from allowing Plaintiff to continue the same accommodation it had already approved and found workable.

164. DCAS did not identify any specific operational difficulties, performance deficiencies, business needs, or other concrete factors that would be adversely affected by continuing Plaintiff's remote work accommodation.

165. DCAS did not engage in any meaningful interactive process or cooperative dialogue with Plaintiff in connection with its July 31, 2024 denial, failing to discuss: (i) alternative accommodations; (ii) modifications to the existing accommodation; (iii) the reasons for its change in position from May 2023; or (iv) what specific hardship, if any, DCAS was experiencing.

166. On or about July 31, 2024, the same date DCAS denied Plaintiff's reasonable accommodation request, Plaintiff's union president directed him to contact Defendant Kazior, provided Kazior's contact information, and told Plaintiff to state that the union had referred him. Plaintiff understood Kazior to be a civil service or accommodation resource who could assist him with the reasonable accommodation process. During the resulting communications, including an approximately 42-minute call on July 31, 2024, Plaintiff explained his reasonable accommodation situation, including that DCAS already had substantial medical documentation and doctors' notes, that DCAS was still denying or refusing his accommodation, and that he was trying to understand what additional information EEO wanted from his physicians.

167. Defendant Kazior advised him to obtain additional medical documentation, include the specific information EEO was requesting, and submit it to the EEO office. Defendant Kazior (an attorney for DCAS's Office of General Counsel) did not tell Plaintiff (i) he was a lawyer or Defendant City's lawyer; (ii) he was acting on behalf of DCAS management, the City, discipline, or any office adverse to Plaintiff; (iii) he represented DCAS's interests; (iv) he did not represent him, and (v) did not warn Plaintiff that information shared with him could later be used by DCAS in connection with a Section 72 examination, discipline, or other adverse action.

168. Plaintiff would later learn that Kazior was a DCAS attorney when he saw emails from him in or around August 2025 directing Plaintiff to attend a Section 72, as explained below.

**Plaintiff Appeals the July 31, 2024 Denial and Continues Working Remotely Pending Review**

169. On July 31, 2024, DCAS denied Plaintiff's request, directed him to return to the office, and informed him that he had until August 10, 2024, to appeal to then-DCAS Commissioner, Defendant Molina.

170. On or about August 9, 2024, Plaintiff submitted a comprehensive formal appeal to Defendant Molina, challenging the July 31, 2024 denial. His appeal explained the medical necessity of continued remote work, supporting medical documentation from his treating physicians, documentation of his successful remote-work performance from May 2021 through July 2024, arguments about DCAS's inconsistent positions between May 2023 and July 2024, and a request to continue working remotely pending the appeal.

171. On or about August 18, 2024, Defendant Molina emailed Plaintiff acknowledging receipt of the appeal and confirming that Plaintiff's medical documentation was under review.

172. In the critical August 18, 2024 email, Defendant Molina explicitly confirmed that, consistent with "standard agency practice," Plaintiff's accommodation to work remotely would continue until a final determination was made on his appeal. Defendant Molina confirmed DCAS's formal agency practice permitting accommodations to continue during appeal review.

173. On or about August 23, 2024, Plaintiff filed his first formal complaint with the NYSDHR, dual-filed with the EEOC, alleging disability discrimination by DCAS, which constituted protected activity

174. The NYSDHR filing tolled the applicable three-year limitations periods for his NYCHRL and NYSHRL claims beginning on August 23, 2024, such that claims accruing on or after August 23, 2021 remained timely if filed in this proceeding after an annulment of the election of remedies.

175. On or about September 4, 2024, Defendant Molina responded to Plaintiff's August 9, 2024 appeal stating: "Your medical documentation does not provide an updated diagnosis or prognosis and fails to provide an update as to when you will be able to make a full return to work."

176. Defendant Molina's statement about Plaintiff's failure to provide an update on a full return to work improperly imposed a requirement that Plaintiff provide an end date for his accommodation -- directly contrary to ADA and Rehabilitation Act guidance that does not place arbitrary durational limits on medically necessary on-the-job accommodations.

177. In addition, Plaintiff's prior medical documentation had provided sufficient medical information to support his accommodation request.

178. The provision of an updated "diagnosis" for an already disclosed permanent or long-term disability is prohibited by the ADA, the Rehabilitation Act, NYSHRL, and NYCHRL.

179. In the September 4, 2024 response, Defendant Molina further stated, without explanation: "In addition, your reasonable accommodation request will cause an undue hardship on the agency's operations." It also stated: "After review of the supporting medical documentation submitted, your appeal is on hold."

180. Defendant Molina's communication informed Plaintiff that DCAS had provided him with a reasonable accommodation extension until September 20, 2024, to allow him time to obtain and submit additional medical documentation including the illegal requirement of an updated "diagnosis" regarding his already disclosed permanent and/or long- term disability.

181. Defendant Molina's communication further stated that once the additional medical documentation was received, it would be reviewed "to determine if the information provided is sufficient *to establish that you have a disability* that warrants an accommodation permitting you to continue to work from home." (emphasis added).

182. His email therefore flatly admitted that the purpose of the request for additional documents was -- only --- to determine the veracity of Plaintiff's permanent and/or long-term disability, which had already been exhaustively disclosed in his prior medical documentation.

183. His request for submission of additional medical certifications regarding a permanent and/or long-term disability for which Plaintiff had already made several submissions, constituted a medical inquiry violation, retaliation, and interference with Plaintiff's accommodation rights.

184. DCAS's appeal process was fundamentally defective because: (i) appeals of French's determinations were reviewed by French herself; (ii) Defendant Molina did not conduct independent investigation or analysis but merely accepted French's conclusions; (iii) the EEO office reported directly to the Commissioner's office, creating an inherent conflict of interest; and (iv) no independent reviewer outside the chain of command that included the EEO office participated in the appeals process.

185. On or about September 9, 2024, as required by the EEO office and Defendant Molina, Plaintiff attended a follow-up medical appointment with his physician to obtain updated medical documentation for the appeal.

186. On or about September 18, 2024, Plaintiff submitted comprehensive additional medical documentation from his treating physicians to Defendant Molina as part of his appeal, including detailed letters from Dr. Sinanaj and Dr. Weinstein addressing Plaintiff's diagnoses, treatment timing and duration, medical necessity, functional limitations, inability to remain away from access to his respiratory treatment equipment for extended periods absent an effective accommodation, and the medical necessity of full-time remote work.

187. By May 19, 2025, DCAS also had updated medical documentation describing Plaintiff's four daily sessions of chest physiotherapy and nebulizer therapy, spaced no more than three hours apart, using specialized respiratory treatment equipment maintained in a stable home-based treatment setting.

188. During the approximately seven-and-a-half-month period from September 18, 2024, through May 9, 2025, Plaintiff continued to work remotely full-time, consistent with Commissioner Molina's August 18, 2024 confirmation that his accommodation would continue during appeal review in line with "standard agency practice."

**DCAS Repeats the Same "Indefinite Accommodation" Position in the NYSDHR Proceeding**

189. On or about October 23, 2024, DCAS submitted a position statement to NYSDHR in response to Plaintiff's discrimination complaint, in which DCAS Deputy General Counsel Michael Reyes ("Deputy GC Reyes") stated: "[T]he EEO's office's determination that Complaint's [sic] request was for an *indefinite* accommodation which could not be granted was correct." (emphasis added). Deputy GC Reyes's statement confirmed that DCAS's policy was to deny indefinite or permanent accommodations, and that this discriminatory policy formed the basis for DCAS's denial of Plaintiff's accommodation requests.

190. Moreover, in the NYSDHR position statement, Deputy GC Reyes improperly offered medical advice contradicting the professional medical judgment of Plaintiff's multiple treating physicians, suggesting that Plaintiff could modify his prescribed treatment regimen by performing treatments "four times a day, every other day, so that if he has treatment on Sundays, he could be in the office on Mondays, Wednesdays, and Fridays."

191. In the October 23, 2024 position statement, Deputy GC Reyes made a prescriptive determination regarding which specific days Plaintiff should work in the office (Mondays, Wednesdays, and Fridays), a scheduling determination that should not have been unilaterally dictated by DCAS's Deputy General Counsel -- who was not a medical professional -- in a position statement to an administrative agency.

192. On or about November 9, 2024, Plaintiff submitted a comprehensive rebuttal to NYSDHR responding to DCAS's October 23, 2024 position statement, including that DCAS denied continued full-time telework based on unsupported and shifting rationales.

193. Plaintiff also asserted: (1) DCAS claimed "undue hardship" without detailed financial data or operational evidence, despite repeated prior approvals without performance or workflow issues; (2) after a leadership change and Plaintiff's September 2022 demotion, DCAS newly treated "site visits" as "essential," although site visits were "less than 2%" of his time and walk-throughs were limited to "Life & Safety Issues"; (3) DCAS second-guessed treating-provider documentation (including multiple daily nebulizer treatments and a non-portable HFCWO vest), discounted office triggers, and denied the request despite a scheduled September 9, 2024 medical appointment, and without an effective alternative; (4) confidential medical materials were disseminated beyond need-to-know; and (5) DCAS labeled the request "permanent" or "indefinite" due to a "chronic and unchanging" condition, then imposed "excessive" repeat documentation demands while Plaintiff continued performing core functions remotely without decline in performance.

**May 2025 Final Appeal Denial, Forced Return-to-Office Schedule, and Coerced Telework Agreement**

194. On or about May 9, 2025, at approximately 11:40 a.m., approximately seven and a half months after Plaintiff submitted additional medical documentation on September 18, 2024, French sent Plaintiff an email issuing a decision on Plaintiff's appeal. In the decision, French stated that the pre-appeal documentation did not provide an updated diagnosis or prognosis or an update as to when Plaintiff could make a full return to work, that the additional documentation did not warrant an accommodation allowing Plaintiff to work remotely five days a week, that the documentation described treatment at home but did not indicate limitations preventing Plaintiff

from reporting to the office, and that Plaintiff therefore had to return to the office three days a week under the City's remote-work pilot program, rather than pursuant to any individualized accommodation tailored to Plaintiff's disability-related limitations.

195. French also expressly stated: "It is my determination that the additional medical documentation provided does not warrant an accommodation allowing you to work remotely five days a week," thereby admitting that she made the determination on the additional documentation Plaintiff submitted in support of his appeal to Defendant Molina.

196. In the same May 9, 2025 email, French did not identify, approve, or implement any effective alternative accommodation. French referred only generally to measures that may be available when Plaintiff was in the office, including a secluded workspace, alternative work schedules, and reasonable breaks during the workday. DCAS did not identify any specific workspace, schedule, or break arrangement, did not explain how any such measure would operate, did not assess whether any such measure would allow Plaintiff to maintain his prescribed treatment regimen and access to home-based respiratory treatment equipment, and did not implement any such measure.

197. Just a few hours later, on May 9, 2025, 2:22 PM, Defendant Molina emailed Plaintiff issuing a final determination on Plaintiff's appeal affirming the denial, which stated: "On September 18, 2024, you submitted additional documentation, which has been reviewed by the DCAS Diversity and EEO Office, and which determined that the documentation did not support a continued full-time remote work accommodation," and further stated that, "[a]fter consideration of the EEO Officer's determination, I am affirming that decision and issuing this final determination on your appeal."

198. Approximately three hours after French's email to Plaintiff on May 9, 2025, Defendant Molina issued a purported final determination "affirming" French's determination, demonstrating that he conducted no meaningful independent investigation or review of Plaintiff's appeal, but instead merely ratified French's conclusion.

199. On or about May 10, 2025, one day after receiving the May 9 denials, Plaintiff filed a second complaint with NYSDHR alleging retaliation by DCAS for his prior complaint, his accommodation requests, and his appeals.

200. The same day, Plaintiff submitted an emergency appeal to Defendant Molina and French requesting temporary continuation of his remote-work arrangement, a stay of the May 9 denial pending submission of additional medical documentation, and/or a stay pending completion of the NYSDHR investigation. He submitted additional medical documentation, a detailed statement of his limitations and needs, and letters of support from colleagues confirming his successful remote work performance.

201. As part of his May 10, 2025 emergency appeal, Plaintiff proposed, without waiving his primary request for continued full-time remote work, that if DCAS contended any site visits were required, DCAS prioritize necessary site visits near his residence and within treatment windows that allowed him to maintain access to his prescribed respiratory treatment regimen.

202. Plaintiff offered this as an additional accommodation and cooperative-dialogue proposal, not as a substitute for full-time remote work, and did not agree that routine in-office attendance or prolonged travel was medically feasible. The proposal was consistent with DCAS's prior approval of remote work with required site visits, DCAS's prior no-undue-hardship finding, and Plaintiff's medical documentation showing his need to remain close to home-based respiratory treatment equipment.

203. Defendants did not meaningfully assess or respond to this proposal. Instead, they continued to insist on a three-day in-office schedule, ordinary Citywide telework, leave usage, and later medical or disciplinary processes, none of which addressed Plaintiff's disability-related need to remain close enough to his home-based treatment equipment.

204. On or about May 15, 2025, only after Plaintiff sent a further follow-up on May 14, 2025, because he had received no acknowledgment or response to his May 10 emergency appeal, French responded stating that the denial communicated on May 9, 2025 "completes the appeal process and the decision is final." French further directed Plaintiff: "You are expected to return to the office three days a week, beginning Monday, May 19, 2025," reiterating a return-to-office date that gave Plaintiff only six business days from the May 9 denials -- and only two business days after French's May 15 email -- to attempt compliance with a directive that would make it impossible for Plaintiff to maintain his medically necessary treatment regimen and would put his life in danger.

205. In the May 15, 2025 email, French stated: "If you believe you are unable to attend in person due to a medical condition, please coordinate with your supervisor regarding the use of any available leave, such as sick leave."

206. French further stated that Plaintiff could submit updated medical documentation if he believed his medical condition had changed or worsened, but that any such submission "does not alter the current determination regarding your return to the office schedule."

207. French's May 15, 2025 instruction that Plaintiff should use sick leave for days he was unable to attend the office represented the beginning of DCAS's policy of forcing Plaintiff to deplete his accrued leave as a purported alternative to providing reasonable accommodation.

208. On or about May 15, 2025, in response to Plaintiff's inquiry regarding who reviewed reasonable accommodation requests at DCAS, French confirmed in writing: "I am the EEO officer and the Disability Rights Coordinator for DCAS. Reasonable Accommodation requests are reviewed by me / the DCAS EEO office."

209. French's May 15, 2025 written confirmation established that DCAS had consolidated the reasonable-accommodation review functions in a single individual rather than maintaining the multi-layered and independent process contemplated by the City's reasonable accommodation procedures.

210. When Plaintiff asked whether it was the agency's position that accommodations without a defined end date, or those considered "permanent," would not be approved, French responded in writing: "That is not the agency's position," contradicting the rationale DCAS had repeatedly used to deny Plaintiff's requests.

211. Plaintiff sent a follow-up email on May 15, 2025 seeking further clarification regarding those issues, but French never responded.

**May 19, 2025 Renewed Accommodation Request, Seventeen-Minute Denial, and Forced Use of Leave**

212. On or about May 16, 2025, under protest and without waiving his rights, Plaintiff signed the telework agreement DCAS required after DCAS refused to continue his full-time remote-work reasonable accommodation. The May 16, 2025 telework agreement did not provide Plaintiff with a disability-based fully remote accommodation. It instead placed Plaintiff under the ordinary Citywide telework schedule, allowing only two remote-work days per week and requiring in-person attendance three days per week.

213. DCAS did not give Plaintiff his first-choice telework days. DCAS assigned Monday and Thursday as Plaintiff's remote-work days and required Plaintiff to report in person on Tuesday, Wednesday, and Friday.

214. Plaintiff signed the agreement only because DCAS had denied his accommodation, directed him to return to the office three days per week beginning May 19, 2025, and told him to use available leave if his medical condition prevented in-person attendance. Plaintiff did not agree that the telework agreement was an effective accommodation, did not waive his reasonable-accommodation rights, and did not agree that routine three-day in-office attendance was medically feasible.

215. On or about May 19, 2025, Plaintiff submitted a new comprehensive formal reasonable accommodation request to the DCAS EEO office, including additional medical documentation, dated May 16, 2025, from his treating physicians.

216. Plaintiff submitted his May 19, 2025 reasonable accommodation request at approximately 11:30 AM.

217. On or about May 19, 2025, at approximately 11:47 AM, a mere seventeen minutes after Plaintiff submitted his new reasonable accommodation request, the DCAS EEO office issued a denial.

218. The seventeen-minute turnaround from submission to denial on May 19, 2025 supports Plaintiff's allegation that DCAS and French conducted no meaningful review of the medical documentation or accommodation request, engaged in no interactive process or cooperative dialogue, and made no individualized assessment before denying the request.

219. On May 19, 2025, the EEO office took the internally contradictory position that Plaintiff's request had already been denied because the same accommodation had been finally

denied on May 9, 2025, while simultaneously representing that Plaintiff's "new request" remained "under review."

220. On May 20, 2025, after Plaintiff explained that his May 19, 2025 submission was a new request, supported by additional medical documentation, that merited its own individualized review, the EEO office responded: "Respectfully, your limited view of the ADA and the City's Reasonable Accommodation policy does not consider the employer's requirement to conduct an undue hardship analysis of the accommodation being requested in addition to, and/or as a result of the medical documentation that an employee provides." This response did not resolve the request and instead confirmed that DCAS was continuing to treat the May 19 submission as pending while refusing any interim continuation of the requested accommodation.

221. Beginning May 20, 2025, Plaintiff was forced to use accrued sick leave and annual leave for the mandatory in-office days on which he was medically unable to report, was required to provide doctor's notes not ordinarily demanded for non-consecutive sick days, and has continued depleting leave banks, instead of receiving the accommodation that would allow him to work.

222. DCAS's use of sick leave and annual leave removed Plaintiff from work on days when he could have worked remotely, depleted his accrued leave, and converted a work-preserving disability-accommodation request into forced leave usage. Because Plaintiff could perform the essential functions and essential requisites of his position through full-time remote work with discrete site visits when assigned and medically feasible, forced leave was a lesser protection than the accommodation Plaintiff requested.

223. Under 29 C.F.R. § 825.702(a)-(b), DCAS was required to analyze Plaintiff's FMLA rights and disability-accommodation rights separately, comply with both legal regimes, and

provide the *greater* applicable protection. DCAS could not satisfy its Rehabilitation Act, ADA, NYSHRL, or NYCHRL accommodation obligations by forcing Plaintiff to deplete leave when a reasonable accommodation would have allowed him to continue working.

224. On May 23, 2025, French stated that Plaintiff's accommodation to work remotely five days a week "was denied and ended on May 16, 2025" and that Plaintiff was "not approved" to return to working remotely five days a week while his new request for the same accommodation was under review -- contradicting Defendant Molina's August 18, 2024 confirmation that "standard agency practice" permitted continued accommodation during appeal review and contradicting DCAS's own prior practice.

225. French's May 23, 2025 email was not the final merits determination of Plaintiff's May 19 request. Rather, it was an interim refusal to permit Plaintiff to continue teleworking full-time while the EEO office claimed that request remained under review.

226. On or about June 18, 2025, after asserting that Plaintiff's May 19, 2025 request remained under review and refusing to permit him to continue teleworking full-time during that review, French sent Plaintiff an email formally denying Plaintiff's May 19, 2025 reasonable accommodation request. French stated: "Based on its review of the additional information provided, the EEO office maintains its determination that your request to work remotely five days a week as an Administrative Project Manager is an undue burden to the agency's operations and is denied" and further stated "[t]he EEO office further determines that based on your documented medical restrictions as of May 16, 2025, there is no effective reasonable accommodation that will allow you to perform the essential functions of your position."

227. Thus, DCAS asserted that there was no effective reasonable accommodation that would allow Plaintiff to perform the essential functions of his position.

228. In the June 18, 2025 denial email, French also made the false, pretextual and retaliatory statement that: "It is also noted that while you have been working fully remotely, you have not been conducting the field visits required of your role." Indeed, this statement was completely false and contradicted by: (i) DCAS's own May 9, 2023 written acknowledgment that his accommodation regarding site visits "imposed no undue hardship to the agency"; (ii) the reality that Plaintiff had conducted site visits on the occasions when such visits were necessary -- in every instance; and (iii) DCAS's provision of assignments to Plaintiff that could be performed remotely consistent with his accommodation.

**June 2025 Foot-Injury Accommodation Request and Denial**

229. On or about June 23, 2025, Plaintiff submitted a separate reasonable accommodation request for a foot injury he had recently sustained. His request sought temporary telework accommodation to allow him to recover from his foot injury while performing his job duties remotely, similar to accommodations DCAS had provided to other employees with temporary injuries.

230. On or about June 25, 2025, French denied Plaintiff's separate reasonable accommodation request for his foot injury, stating: "It has been determined by the agency that your medical limitations/restrictions as described by your medical provider in your May 16, 2025, medical note already prevents you from fulfilling the essential duties of your position, including field visits."

231. Plaintiff alleges that French and DCAS's failure to approve Plaintiff's accommodation request for his foot injury was retaliation for his protected activity.

**Plaintiff Appeals the June 18, 2025 Denial; Defendant Molina Affirms on July 15, 2025**

232. On or about June 27, 2025, Plaintiff submitted a formal appeal to Defendant Molina challenging the June 18, 2025 denial of his May 19, 2025 reasonable accommodation request. In his appeal, Plaintiff explicitly requested that, consistent with Defendant Molina's August 18, 2024, confirmation of "standard agency practice," he be allowed to continue teleworking full-time while the appeal was under review.

233. Defendant Molina did not acknowledge Plaintiff's request to continue teleworking full-time during the appeal and did not permit Plaintiff to do so, despite his earlier confirmation that standard agency practice allowed accommodations to continue pending appeal.

234. On or about July 15, 2025, Defendant Molina issued a denial of Plaintiff's June 27, 2025 appeal. In the July 15, 2025 denial, Molina stated: "After careful consideration, I am affirming the EEO Office's determination." Defendant Molina also failed to assess whether any accommodation short of ordinary full-day office attendance would have allowed Plaintiff to perform the essential requisites of his position.

235. Molina further stated: "As noted in the EEO Office's determination, your position as an Administrative Project Manager includes responsibilities that require in-person fieldwork. These duties are fundamental to the role and cannot be effectively performed on a fully remote basis."

236. Defendant Molina's statement was contradicted : (i) DCAS's May 9, 2023 written acknowledgment that his prior accommodation regarding site visits "imposed no undue hardship to the agency"; (ii) Plaintiff's successful performance of his position remotely from May 2021 through July 2024 (over three years); and (iii) DCAS's own provision of work assignments to

Plaintiff that could be performed remotely. It also ignored that Plaintiff has conducted all site visits requested of him in his prior role and in his new role.

237. In the July 15, 2025 denial, Defendant Molina stated: "Your medical documentation, dated May 16, 2025, describes a treatment regimen requiring four daily sessions of chest physiotherapy and nebulizer therapy, spaced no more than three hours apart. This regimen requires close proximity to specialized medical equipment in a private, home-based setting. As a result, you are unable to be away from your residence for extended periods of time, which precludes you from performing essential job functions that require an on-site presence."

238. Defendant Molina further stated in the denial: "Given these limitations, the agency has determined that no effective reasonable accommodation is available that would enable you to perform all essential functions of your position without imposing an undue hardship on agency operations. Accordingly, your request for full-time telework is denied."

239. Defendant Molina's July 15, 2025 assertion that no effective reasonable accommodation was available was unsupported by any evidence, contradicted by Plaintiff's years of successful remote performance, and ignored Riollano's May 5, 2023 memorandum emphasizing the reduced importance of site visits.

**Plaintiff's Approved Vacation and DCAS's August 25, 2025 Coordinated Retaliation**

240. On or about May 14, 2025, Plaintiff notified management of his planned time off later in the summer, and on or about July 15, 2025, Plaintiff sent a follow-up email confirming that his planned time off would run from July 28, 2025, through August 29, 2025. In an effort to mitigate any impact on operations, Plaintiff offered a partial-telework solution -- offering to telework approximately two days per week while on vacation. Management rejected that proposal and instructed that Plaintiff should take his original time-off request.

241. On or about August 25, 2025, approximately three months after Plaintiff filed his May 10, 2025 NYSDHR retaliation complaint, and six weeks after Defendant Molina's July 15, 2025 denial of Plaintiff's appeal, DCAS took multiple severe materially adverse actions against Plaintiff in a single coordinated day of retaliatory conduct. On the morning of August 25, 2025, DCAS notified Plaintiff that the last week of his previously approved vacation leave (scheduled for August 25-29, 2025) was being revoked, effective immediately, and that he would need to report to the office or be marked AWOL. This was retaliatory, threatening, intimidating, and coercive.

242. On August 25, 2025, Poulton and Riollano sent Plaintiff an email stating that effective immediately, he would be removed from his current supervisor and placed under Poulton's direct supervision, further marginalizing Plaintiff within the organization.

243. Plaintiff was also informed at the same time that: "In addition, your telework privileges have been revoked and you are expected to be in the office full-time beginning Tuesday, September 2, 2025. Please let me or Marina know if you have any questions about your workspace. And, as a reminder, as of July 15 you do not have a reasonable accommodation in place. If you need one, please reach out to Belinda French."

244. The August 25, 2025 revocation of all telework privileges -- requiring him to be in the office five days a week, rather than the three days per week that had been required by the telework pilot program – constituted a significant escalation of adverse action against Plaintiff, making it even more impossible for Plaintiff to maintain his medical treatment regimen.

245. At this time, upon information and belief, through the present, many if not most other non-disabled employees in the office continued to work two days a week remotely.

246. DCAS also violated the notice terms of the telework agreement which required at least one week's notice, or twenty-four hours' notice in a non-emergency situation, neither occurred.

247. The same day, on August 25, 2025, Executive Counsel, Defendant Kazior, from DCAS's Office of General Counsel communicated via email that Plaintiff was scheduled to undergo a mandatory medical examination with an Independent Medical Examiner ("IME") pursuant to Civil Service Law § 72.

248. The Section 72 medical examination was scheduled for August 27, 2025, at a specific time and location designated by DCAS, which fell within the week of August 25-29, 2025 -- the same week of Plaintiff's approved vacation leave that DCAS had just revoked earlier that same day (August 25).

249. The scheduling of the mandatory Section 72 examination for August 27, 2025, during Plaintiff's previously scheduled vacation period that had been approved months in advance, and was only revoked on August 25, 2025, demonstrated coordination among DCAS officials to maximize disruption and retaliation, coercion, threats, and intimidation against Plaintiff.

250. Plaintiff offered to reschedule the Section 72 examination to September 29, 2025, but DCAS refused to reschedule, insisting the examination must occur on August 27, 2025.

251. On or about August 26, 2025, Plaintiff's then legal counsel emailed Defendant Kazior demanding that DCAS immediately cease its retaliatory conduct against Plaintiff.

252. Following this last-minute retaliatory revocation of his vacation for the week of August 25-29, 2025, DCAS retaliatorily marked Plaintiff as AWOL (absent without leave) in Plaintiff's employment records with negative consequences for eligibility for promotion and/or transfer to a different agency.

253. On or about August 27, 2025, Plaintiff provided DCAS with additional medical notes from his treating physician further documenting his inability to work due to his medical condition, which Poulton illegitimately rejected that same day when she stated: "Sick time is to be used for medical ailments which make you unable to work."

254. On or about August 28, 2025, DCAS rescheduled the Section 72 examination from the originally scheduled August 27, 2025 date, to September 25, 2025, characterizing the examination as a "Fit for Duty Examination."

**DCAS Unilaterally Places Plaintiff on FMLA Leave Without Notice or Consent**

255. On or about August 26, 2025 and September 2, 2025, Plaintiff's then legal counsel sent a formal letter Defendant Kazior (DCAS Office of General Counsel) demanding that the retaliation and discrimination against Plaintiff immediately end.

256. On or about September 12, 2025, ten days later, Defendant Kazior emailed Plaintiff's then legal counsel with an attached letter from Human Resources stating that Plaintiff had been "approved" for FMLA leave.

257. The leave-approval letter imposed a staged paid/unpaid leave schedule and a fixed "return-or-resign" ultimatum, stating: "[c]ommencing September 2, 2025 through November 24, 2025, you were placed on FMLA leave with pay," "from November 25, 2025 through March 6, 2026, you will be placed on an approved medical leave with pay," and "from March 9, 2026 through August 28, 2026, you will be placed on an approved medical leave without pay." The letter further stated, "You are tentatively scheduled to return to work on Monday, August 31, 2026," that "you will not be able to request additional extensions,"" and that "[i]n the event that you are unable to return to work as scheduled, you must fill out the attached Resignation form."

258. Neither Plaintiff nor his legal counsel had requested FMLA leave at any time prior to September 12, 2025.

259. Defendant City had not previously sent Plaintiff the required FMLA statutory eligibility and rights and responsibilities notices required by 29 C.F.R. §§ 825.300 (b)-(c), describing his rights under the FMLA.

260. DCAS placed Plaintiff on an involuntary FMLA leave, instead of granting his disability-based remote work accommodation, in retaliation for his protected activities of requesting disability accommodations and/or complaining about discrimination, retaliation, and failure to accommodate.

261. DCAS could not lawfully use FMLA leave, sick leave, medical leave, unpaid leave, or a return-or-resign track as a substitute for the disability-based remote-work accommodation that would have allowed Plaintiff to continue working. Federal FMLA regulations provide that FMLA leave rights are wholly distinct from reasonable-accommodation obligations under the Rehabilitation Act and ADA, that FMLA does not limit existing disability rights and protections, and that the employee must be afforded the greater available right under the statute, in this case he requested an effective accommodation. 29 C.F.R. § 825.702(a).

262. Because Plaintiff was able to perform the essential functions and essential requisites of his position with full-time remote work and discrete site visits when assigned and medically feasible, the greater statutory right was the right to continue working with a reasonable accommodation absent undue hardship or direct threat. Forced leave was the lesser protection because it removed Plaintiff from active work, depleted his accrued leave, placed him on a path to unpaid leave, threatened his income and benefits, and culminated in a return-or-resign deadline.

263. On or about September 19, 2025, Plaintiff's then legal counsel emailed Defendant Kazior requesting clarification regarding the unsolicited and involuntary FMLA placement, noting that neither Plaintiff nor his counsel had applied for, requested, or sought FMLA leave.

264. On or about September 19, 2025, Kazior responded to Plaintiff's counsel: "He requested sick leave. He doesn't need to specifically request FMLA leave if the employer has sufficient certification from the doctor to place the employee on FMLA."

265. Defendant Kazior's statement that Plaintiff requested sick leave was false. Plaintiff did not request sick leave from DCAS. Rather, DCAS's EEO office directed and instructed Plaintiff to use his accrued sick leave for days when he was unable to report to the office due to his medical condition, because of DCAS's refusal to accommodate him.

266. DCAS's EEO office's May 15, 2025 email to Plaintiff had specifically stated: "If you believe you are unable to attend in person due to a medical condition, please coordinate with your supervisor regarding the use of any available leave, such as sick leave."

267. Plaintiff's use of sick leave beginning May 20, 2025, was pursuant to DCAS's directive, not Plaintiff's voluntary request, and DCAS's characterization of this forced leave usage as a "request" by Plaintiff was false and misleading.

268. DCAS's failure to provide Plaintiff with required eligibility notice and/or rights and responsibilities notice, within five business days after it had reason to know that Plaintiff's absences and leave usage might have been for an FMLA-qualifying reason, deprived Plaintiff of his rights under the FMLA to decide whether and when to invoke his FMLA protections and utilize his FMLA leave entitlement.

269. DCAS's forced placement of Plaintiff on FMLA leave did not represent the result of a good faith interactive process or cooperative dialogue but instead a punitive and retaliatory

initial step towards the intentional exhaustion of his leave and his eventual termination when his accrued leave terminated.

270. DCAS's forced-leave approach inverted the required statutory analysis. Rather than determine whether Plaintiff could continue performing his job with a reasonable accommodation, DCAS treated his medical need for an accommodation as a presumptive reason to remove him from work altogether instead of accommodating him. That approach violated the principle that FMLA rights and disability-accommodation rights must be analyzed separately.

271. The prejudice was not limited to lack of timely FMLA notice. Plaintiff was also prejudiced because DCAS converted an accommodation request into a leave-exhaustion track, depriving him of the greater protection of continuing to work with accommodation, preserving his pay, preserving his accrued leave, preserving his benefits, maintaining his active employment status, and avoiding a return-or-resign ultimatum.

**DCAS Compels a Retaliatory Section 72 Fitness-for-Duty Examination**

272. Before compelling the Section 72 examination, DCAS had not identified any documented performance failure showing that Plaintiff was "unfit" for his role and could not perform the essential requisites of his position remotely with discrete site visits as needed.

273. The Section 72 process therefore did not respond to an actual inability to perform work. It followed Plaintiff's accommodation requests, NYSDHR complaints, counsel letters, forced leave dispute, telework revocation, and AWOL dispute.

274. At the examination with Dr. Edward Eden, on September 25, 2025, Plaintiff explained that he had successfully performed his Project Executive/Administrative Project Manager duties for years under an approved reasonable accommodation of full-time telework to permit daily prescribed respiratory treatments; that the position is primarily administrative, with

site visits only a limited component; and that he continued completing required site visits within treatment windows, typically no more than approximately 2.5 hours including travel, without any performance deficit. He reported DCAS forced him to use personal leave on days he could not report in person, pressed in-office attendance even though he could work remotely, and advised that DCAS had supplied the examiner a partial, curated record and omitted key documentation about Plaintiff's work and site visits.

275. The examiner refused to review Plaintiff's proffered records and stated, in sum and substance, that he could "only go with what [he had] been provided," confirming DCAS's control over the information considered in the § 72 process.

276. During the examination, Dr. Eden stated, in sum and substance, that it was "interesting" that the City's position had changed if plaintiff was "doing [his] job well." Those statements support an inference that the Section 72 process was being used pretextually rather than because Plaintiff could not perform his job.

277. Subsequently, on October 16, 2025, Plaintiff's counsel requested a copy of the medical exam.

278. On October 20, 2025, Kazior refused to provide the medical exam stating: "Section 72 of Civil Service Law only requires disclosure of [the] medical report if the Agency seeks to place the employee on a leave of absence. If we seek to place Mr. Berdynaj on such leave of absence, I will provide the report at that time."

279. Because DCAS did not place Plaintiff on a Section 72 leave of absence after the examination, and because DCAS stated that it would provide the medical report if it sought such leave, upon information and belief, the examination did not result in a finding warranting a Section 72 leave of absence.

280. Defendants subjected Plaintiff to a retaliatory Section 72 exam.

**DCAS Again Denies Plaintiff's Disability Accommodation Request**

281. On or about November 12, 2025, following instructions from Defendant Kazior, Plaintiff's legal counsel submitted a comprehensive new reasonable accommodation request on Plaintiff's behalf, which included: included: (i) a detailed cover letter explaining Plaintiff's disability and accommodation needs; (ii) updated medical documentation from Dr. Sinanaj, dated November 7, 2025; (iii) additional medical documentation from Dr. Weinstein; and (iv) legal arguments regarding DCAS's obligations under the ADA.

282. On or about November 20, 2025, Defendant French issued a denial of the November 12, 2025, reasonable accommodation request submitted by Plaintiff's attorney, which stated: "This office received your reasonable accommodation request, submitted by your attorney . . . seeking to telework five days per week due to medical conditions, supported by letters from two physicians. Because the request is materially the same as your previous requests, which were denied, most recently with the denial affirmed on appeal on July 15, 2025, your current request is denied for the same reasons as the prior determination."

283. French's November 20, 2025 denial demonstrated that DCAS: (i) conducted no review of the updated medical documentation dated November 7, 2025; (ii) engaged in no good faith additional interactive process with Plaintiff or his attorney regarding accommodation options; (iii) made no individualized assessment of whether accommodation was possible or reasonable; and (iv) applied a blanket policy of denying any accommodation request that was "materially the same as" prior requests, regardless of changed circumstances, updated medical documentation, or legal arguments.

**DCAS Brings Retaliatory and Pretextual Disciplinary Charges While Plaintiff Remains on Leave**

284. On or about January 22, 2026, approximately three months after this additional request for a disability-based remote work accommodation, while Plaintiff remained on an involuntary leave, Defendant Kazior further retaliated against Plaintiff for his protected activity. Kazior served Plaintiff with a "Statement of Charges" and "Notice of Informal Conference," alleging misconduct and conduct prejudicial to the City in violation of the DCAS Code of Conduct.

285. The January 22, 2026 charges alleged false timesheets, false approvals, travel-related misconduct, false accommodation requests, and receipt of pay for time not worked, including allegations under N.Y. Penal Law §§ 175.35 and 155.25.

286. These charges -- including the document's allegations of criminal violations-- were false, retaliatory and/or pretextual.

287. Contrary to these allegations, during all of the referenced hours and time periods, Plaintiff was in fact working remotely for DCAS. Plaintiff did not submit false documents to the agency by submitting a timesheet which contained false information; did not fail to accurately reflect his work hours; did not knowingly cause a false document to be submitted to the agency when he had his supervisor approve his timesheet; did not receive payment for time he did not work; did not engage in travel-related misconduct as alleged; and did not file false reasonable accommodation requests.

288. Plaintiff did not violate New York State Penal Law, including Sections 175.35 and 155.25, or otherwise fail to comply with New York law.

289. DCAS interfered with and retaliated against Plaintiff for his good faith reasonable accommodation requests on May 7, 2020, September 12, 2022, May 15, 2025, and November 12,

2025, by explicitly charging him for allegedly making false accommodation requests on those dates.

290. These false, pretextual, and/or retaliatory charges were also based in whole or in part on Plaintiff working remotely and were not based on Plaintiff having actually committed these alleged violations.

291. Even if Defendant City in good faith believed the charges, the charges were brought, overcharged, and/or made when and how they were made, because of Plaintiff's prior protected activities of requesting disability accommodations and protected complaints of discrimination and retaliation.

292. Defendant City's charges are false, pretextual, and/or retaliatory.

**DCAS Keeps Plaintiff Out of Work and Demands a "Full Duty" or "Without Restrictions" Return Note**

293. After serving the January 22, 2026 charges, and while Plaintiff remained on involuntary medical leave, Defendant City continued to keep Plaintiff out of work.

294. During that period, Plaintiff sought clarification regarding his return-to-work status and what, if any, medical documentation or conditions Defendant City claimed were required for him to return to work.

295. On March 4, 2026, as Plaintiff neared the beginning of his unpaid portion of his leave scheduled to begin March 9, 2026, and unable to afford supporting his family while on an unpaid leave, DCAS initially informed him: "Please note, in order for you to return to work, I need a medical note on an official letterhead stating the return to work date, and must say that you are able to return to work *full duty or without restrictions*." (emphasis in original).

296. The requirement to return "full duty" or "without restrictions" was an articulation of a 100% healed policy prohibited by the Rehabilitation Act, ADA, NYSHRL, and NYCHRL.

297. Plaintiff was further instructed that: "The medical note must have the treating physician's signature as well as their medical stamp or license number."

298. These arbitrary medical documentation requirements violated the Rehabilitation Act and ADA because they were not job-related and/or required by business necessity.

299. Indeed, the request violated DCAS's own policy on medical documentation concerning disability accommodations, which states that an agency "cannot require a specific type or form of documentation," and that "'medical documentation' should be considered broadly."

300. Similarly, the request for additional medical documentation was an additional medical inquiry violation and additional retaliation for Plaintiff's prior accommodation requests and/or protected complaints.

301. This response imposing a "full duty" or "without restrictions" requirement, without and/or before any individualized inquiry, is the exact approach prohibited by EEOC guidance, and constituted a further failure to accommodate.

302. This "full duty" and "without restrictions" requirement imposed an overbroad return-to-work standard inconsistent with the individualized assessment required by the EEOC guidance, Rehabilitation Act, ADA, NYSHRL, and NYCHRL.

303. On or about March 5, 2026, Plaintiff renewed his request for a reasonable accommodation to work remotely on a full-time basis due to his medical condition.

304. As of the filing of his initial Complaint and this Amended Complaint, Plaintiff has still not been permitted to return to work with the disability-based remote work accommodation that would allow him to carry out the essential functions of his job.

**Defendants Continue to Retaliate and Discriminate After Plaintiff Files Class Action Complaint**

305. On March 16, 2026, Plaintiff filed his Class Action Complaint in this matter against the Defendant City.

306. On March 28, 2026, after Plaintiff filed this lawsuit and after DCAS had already provided the same disciplinary charges through multiple channels, including to Plaintiff's union representative, former counsel, current counsel, Plaintiff's personal email, Plaintiff's work email, and USPS, an individual came to Plaintiff's home, taped the charges directly to Plaintiff's front door in plain view without knocking or ringing, photographed the papers, and left.

307. This method of service was unnecessary, excessive, retaliatory, intimidating, and invasive. It exposed sensitive disciplinary allegations, including allegations of criminal violations, to Plaintiff's family, household members, mail carrier, and anyone else who could see Plaintiff's front door, despite DCAS already having multiple less intrusive methods to provide notice. Plaintiff has video and photographic evidence showing the exposed papers and the manner in which they were left.

308. A little over three week later, on or about April 9, 2026, DCAS denied Plaintiff's renewed March 5 request for a reasonable accommodation to work remotely on a full-time basis due to his medical condition.

309. On or about April 17, 2026, Plaintiff appealed the April 9, 2026 denial of his requested full-time remote-work accommodation.

310. On April 27, 2026, to avoid loss of further pay, employment status, and health insurance for his family, Plaintiff told French that he would return and perform his duties beginning April 29, 2026, under protest and without waiving his claims: "The April 9 determination states that it 'does not prevent' me from returning to work and, in the agency's words, 'performing the

essential functions of my position, including required in-person workdays and field visits.' Based on that statement, and to avoid further loss of pay, accrued leave, and employment status, I will be returning to work and will perform my assigned duties beginning this Wednesday, April 29th. My return is under protest, due to financial necessity, and to mitigate further losses. My return should not be treated as a waiver of my reasonable accommodation appeal, pending claims, defenses, remedies, or position that DCAS unlawfully denied, limited, and handled my reasonable accommodation requests."

311. French told Plaintiff to confirm with Human Resources.

312. That same day, DCAS's Human Resources sent Plaintiff a letter instructing Plaintiff again that, because his accommodation was denied, he still had to produce a full-duty or no-restrictions note before returning. The letter stated in part: "I was just made aware that you were denied for Reasonable Accommodation. Just a gentle reminder, that in order for you to return to work, you will need to provide me with a medical note on an official letterhead, stating that you are able to return to work full duty or without restrictions. The letter be signed, dated and have the treating physician's medical stamp or license number."

313. DCAS trapped Plaintiff in a no-win situation. DCAS's EEO Office says Plaintiff's accommodation is denied but that the denial should not stop him from returning to work. Human Resources says Plaintiff cannot return without a full-duty or no-restrictions note unless an accommodation is approved or in progress. Because Plaintiff's disability is chronic, Plaintiff cannot obtain a no-restrictions note. Because the EEO Office denied the accommodation, Plaintiff cannot meet Human Resources' alternative. Because of Defendants' discriminatory and retaliatory conduct, Plaintiff remains out of work.

314. At the April 30, 2026 Step 1 conference regarding the retaliatory charges DCAS brought against Plaintiff, Defendant Kazior stated that the recommended penalty would be termination and that there was little room for anything short of termination or resignation *unless* Plaintiff returned to the office three days per week, worked remotely two days per week "as a normal employee," and he "dismiss[ed] [his] lawsuit," confirming directly that the disciplinary action, its continuation, and/or withdrawal are directly tied to his protected activity -- direct evidence that his protected activity of filing this lawsuit is at least a motivating factor regarding his disciplinary charges, and circumstantial evidence of disability animus based on the disparaging reference to Plaintiff as not a "normal" employee.

315. Kazior's reference to Plaintiff working "as a normal employee" treated Plaintiff's disability-based accommodation status as *abnormal* and inferior to non-disabled employees. The statement supports an inference of disability-based animus, disparate treatment, disability accommodation retaliation, and a disability-based and retaliation-base hostile work environment.

316. In addition, by linking any materially more favorable resolution of the disciplinary charges to Plaintiff's dismissal of this lawsuit and return without his requested disability accommodation, Defendants used the disciplinary process to pressure Plaintiff to stop exercising rights protected by the Rehabilitation Act, ADA, NYSHRL, and NYCHRL. That conduct and/or attempted conduct, was coercive, threatening, intimidating, retaliatory, and reasonably likely to interfere with Plaintiff's continued prosecution of this action and pursuit of disability-accommodation rights.

317. On May 8, 2026, Defendant Kitasei (present Commissioner of DCAS) emailed Plaintiff, copying Sylvia Li, regarding Plaintiff's April 17, 2026 appeal.

318. In her May 8, 2026 appeal determination, Defendant Kitasei stated that the appeal concerned the denial of Plaintiff's request for a reasonable accommodation to work remotely on a full-time basis due to his medical condition. She stated she reviewed the materials submitted with Plaintiff's appeal, including Plaintiff's supporting documentation and the findings of the Diversity and Equal Employment Opportunity Office, and affirmed the EEO Office's determination and denied Plaintiff's appeal.

319. Kitasei's denial did not identify any new individualized operational analysis, any new undue-hardship evidence, any effective alternative accommodation, or any explanation for why Plaintiff's prior successful full-time remote-work accommodation could not continue.

320. Defendant Kitasei's May 8, 2026 denial continued and ratified the same policy, practice, custom, and/or standard operating procedure challenged in this action.

321. Defendant Kitasei's May 8, 2026 denial occurred after Plaintiff had filed this action and after Plaintiff had engaged in repeated protected activity concerning disability discrimination, retaliation, and reasonable accommodation.

322. Kitasei's May 8 denial constitutes continuing disability discrimination, continuing failure to accommodate, continuing failure to engage in cooperative dialogue, continuing retaliation, continuing interference with rights, and/or aiding and abetting of the same.

**CONTINUING VIOLATION REGARDING RETALIATION CLAIMS**

323. Plaintiff asserts Rehabilitation Act and NYCHRL class claims as to acts occurring on or after March 16, 2023, pursuant to the applicable three-year limitations period measured back from the date of the filing of this Complaint. Plaintiff further alleges violations of the Rehabilitation Act and the NYCHRL between September 2022 and March 16, 2023, based on alleged continuing violations beginning at least as of September 2022, based on: (1) a pattern

and/or practice of retaliation against employees who requested disability-based remote work accommodations; and (2) a retaliation based hostile work environment for employees who requested disability-based remote work accommodations.

## CLASS ACTION ALLEGATIONS

324. Plaintiff brings this action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) on behalf of the Permanent Disability Denial Class, the Remote Work Request Retaliation Class, and the Medical Inquiry Class (as defined above).

325. Excluded from the Classes are: (1) Defendants; (2) Defendants' executive/senior level officials and managers; (3) Plaintiff's direct and indirect supervisors; (4) judge(s) to whom this action is assigned and any member of their immediate families; and (5) all persons who have previously filed individual actions in state or federal court asserting Rehabilitation Act, ADA, NYSHRL, NYCHRL, or FMLA claims against Defendant City.

326. Class membership can be identified through objective criteria and by reference to Defendant City's records, including (among other things) disability accommodation request forms, medical submissions, written accommodation determinations, and DCAS reasonable- accommodation files.

327. Plaintiff reserves the right to amend the proposed class definitions and/or to propose subclasses as discovery reveals additional facts and grounds for certification.

328. Common questions of law and fact common to the Classes include, but are not limited to, whether:

a. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure that disability

accommodations (including remote work) cannot be "permanent" or "indefinite," and denies requests on that basis including treating "indefinite duration" as a per se "undue hardship" rather than conducting the required individualized assessment;

b. Defendant City's DCAS agency maintains a policy, pattern and/or practice, and/or standard operating procedure of a presumption against disability accommodations (including remote work) that are "permanent" or "indefinite," rather than conducting the required individualized assessment;

c. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure of retaliation against employees who make disability-based fully remote work accommodation requests;

d. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure of requiring unnecessary submission of additional medical documentation from Defendant's DCAS agency employees with permanent, long-term, and/or obvious disabilities in support of their previously approved disability-based accommodations more frequently than once a year;

e. Defendant City's DCAS agency's policy position that accommodations cannot or should not be "permanent" or "indefinite" constituted a blanket prohibition on long-term disability accommodations that violates the Rehabilitation Act's, ADA's, and NYCHRL's individualized assessment requirement and discriminates against employees with permanent, long-term, obvious, and/or chronic disabilities requiring permanent and/or long-term accommodations;

f. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure under which reasonable disability accommodation requests are rejected or curtailed if they are "permanent," "indefinite," or lack a defined end date, with Defendant's DCAS agency treating "indefinite" duration as a proxy for undue hardship rather than conducting the individualized assessment required by law;

g. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure of denying permanent, long-term, and/or indefinite disability accommodation requests;

h. Defendant City's DCAS agency maintains and applies a policy, pattern and/or practice, and/or standard operating procedure of denying

disability accommodations to employees with permanent, long-term, obvious, and/or indefinite disabilities;

i. Defendant City 's DCAS agency implemented and communicated a categorical rule that "reasonable accommodations are typically not permanent or indefinite;"

j. Defendant City's DCAS agency treated the "indefinite" nature of disability accommodations as disqualifying in and of itself;

k. Defendant City's DCAS agency treated permanent, long-term, and/or indefinite disability accommodations as equivalent to a finding of an undue hardship;

l. Defendant City's DCAS agency imposed maximum total or presumptive time limits on disability accommodations including for employees with permanent, long-term, obvious, and/or indefinite disabilities;

m. federal regulations and EEOC guidance interpreting the ADA (applicable to the Rehabilitation Act) provide that many individuals with disabilities require permanent or indefinite accommodations, and that employers must provide such accommodations unless they impose undue hardship despite their duration;

n. Defendant City's DCAS maintains centralized accommodation decision-making (through a single office/official) resulting in uniform application of its policies regarding disability accommodations, including, but not limited to the presumption against "permanent" or "indefinite" disability accommodations and regarding medical inquiries;

o. Defendant City 's DCAS agency fails to conduct an individualized essential functions analysis for remote work accommodation requests (including whether the core duties can be performed by computer/phone/video without on-site presence);

p. Defendant City's DCAS agency fails to engage in, or unlawfully truncates, the required interactive process or cooperative dialogue including by imposing fixed end dates or categorical limits instead of an individualized, ongoing assessment;

q. Defendant City 's DCAS agency's "end date" practice functions as a constructive denial by forcing employees into leave status, unpaid status, or other adverse timekeeping outcomes when the employee remains able to work with the accommodation;

r. the Rehabilitation Act, ADA, or NYCHRL permit re-examination of the existence of a disability concerning a disability accommodation previously granted for permanent and/or long-term disabilities, and if so, in what contexts;

s. the Rehabilitation Act, ADA, or NYCHRL impose any maximum durational limit on otherwise meritorious reasonable accommodations for employees with permanent, long-term, obvious and/or chronic disabilities;

t. Defendant City's DCAS agency maintains and applies a policy, pattern, and/or practice of aiding and abetting violations of NYCHRL;

u. Defendant City DCAS agency maintains and applies a policy, pattern, and/or practice of interference with the Classes' Rehabilitation Act, ADA, and/or NYCHRL rights;

v. Defendant City, through DCAS and CEI, communicated, maintained, or permitted a Citywide presumption, implication, and/or custom that many or most disability-accommodation requests were unmeritorious, abuses of the system, and/or bad faith;

w. the challenged policies and practices are generally applicable to the Classes;

x. Defendant City's DCAS agency can meet its burden to show that any of its otherwise illegal above-described policies can be supported by a class-wide or generally applicable showing of an undue hardship such as an applicable class-wide showing that permanent or indefinite disability accommodations are a per se or generally applicable undue hardship regardless of individualized circumstances;

y. class-wide declaratory relief is warranted, and if so, the scope of such declaratory relief;

z. class-wide injunctive relief is warranted, and if so, the scope of such injunctive relief;

aa. Defendant City's DCAS's policies, patterns and/or practices, and/or standard operating procedures described above unlawfully discriminate against employees with disabilities; and

bb. an award of attorney's fees and/or costs is warranted, and if so, in what amounts.

329. Plaintiff's claims are typical of the Classes' claims.

330. Plaintiff's and the Classes' claims arise from the same course of conduct – Defendant City's maintenance and application of the challenged policies, practices and/or procedures, and/or standard operating procedures.

331. Plaintiff is a member of the Classes he seeks to represent.

332. The members of the Class(es) identified herein are so numerous that joinder of all members is impracticable.

333. Although Plaintiff does not know the precise number of the members of the Classes, their number is greater than can be feasibly addressed through joinder.

334. DCAS employed at least 2,000 employees throughout the relevant period.

335. Public New York City data shows that disability status is not rare in the relevant labor pool. The prior City's Comptroller reported that 277,747 New York City residents ages 25 to 55, or 7.6 percent of that age cohort, have a disability.[9]

336. Applying this 7.6 percent working-age disability rate to DCAS's estimated workforce of at least 2,000 employees yields an estimate of approximately 152 current DCAS employees with a disability.

337. In addition, in response to a FOIL request, DCAS's FOIL officer confirmed on March 9, 2026 that there have been approximately 400 disability-based remote work accommodation requests made by DCAS employees since January 21, 2022.

338. The 400-request figure makes numerosity plausible because it shows a substantial DCAS-specific pool of employees and requests from which members of the Remote Work Request

[9] *N.Y.C. Comptroller Brad Lander, Spotlight: Disability and Employment in New York City (July 2024)* at 7 to 8 & Chart 1.

Retaliation Class and the Medical Inquiry Class can be identified through Defendant City's own records.

339. Using a public-sector benchmark under which telework accounted for approximately 16% of disability accommodation requests,[10] the approximately 400 disability-based remote work accommodation requests identified by DCAS, support a reasonable estimate of roughly 2,500 total disability accommodation requests during the same period – approximately 400 for remote work accommodations and approximately 2,100 for all disability accommodations.

340. Published empirical research further supports the inference that disability accommodation requests are not rare and that non-full implementation is also not rare. In a 2025 peer-reviewed study of 993 respondents at a major statewide university-based health system: (1) 70.2% of workers with disabilities reported having ever requested accommodations; and (2) 50.0% reported that their most recent requested change or accommodation was made, while 24.1% reported it was made only partially and 25.9% reported it was not made.[11]

341. Applying the 50% denial or partial denial rate to the estimated 2,100 disability accommodations for accommodations other than remote work, results in an estimate of 1,050 denied or partially denied disability accommodations seeking accommodations other than remote work.

---

[10] *See Treasury Bd. of Can. Secretariat, May 2019 Survey on Workplace Accommodations in the Federal Public Service* at 41 Table 9, at https://www.canada.ca/en/government/publicservice/wellnessinclusion-diversity-public-service/diversity-inclusion-public-service/accessibility-publicservice/benchmarking-study-workplace-accommodations/baseline-analysis-2019-survey-workplaceaccommodations-federal-public-service.html.

[11] *See* Yana van der Meulen Rodgers, Lisa Schur, Flora M. Hammond, Renee Edwards, Jennifer Cohen & Douglas Kruse, *Disability, Job Satisfaction, and Workplace Accommodations: Evidence from the Healthcare Industry*, *J. Occupational Rehab.* at 6 Table 3 (published online July 28, 2025), available at https://link.springer.com/article/10.1007/s10926-025-10316-0.

342. Similarly, applying the figure that 70.2% of workers with disabilities who reported they requested accommodations supports an estimate that at least 70.2 % of the 152 estimated DCAS employees with a disability requested a disability accommodation of some kind, resulting in an estimated approximately 106 disabled employees who requested a disability accommodation, of which approximately 53 were denied their requested accommodation(s).

343. Similarly, given DCAS's stated policy of reevaluation of previously granted remote-work accommodations, including as described in its August 23, 2022 agency-wide email stating that it was "currently assessing the ongoing medical needs for all telework / remote work accommodations," it had already approved, further supports plausible numerosity for the Classes.

344. Taken together, these facts and estimates plausibly support that the Class(es) contain at least forty members.

345. The exact numbers making up each class are uniquely within Defendant City's custody and control and are obtainable in discovery.

346. DCAS's own written policies and quarterly EEO reporting materials establish that reasonable accommodation recordkeeping is centralized, mandatory, and maintained in the ordinary course of business.

347. The City's Reasonable Accommodation Procedural Guidelines require each agency to keep a complete written record of each accommodation request, all steps taken to review the request, the decision, any appeal, and the dates of each action.

348. The same Guidelines require each agency to maintain accommodation records as confidential agency records, keep medical information in separate medical files, and require the EEO officer to record and track all accommodation requests and outcomes and maintain all requests, supporting documentation, and outcomes.

349. The NYC EEO Policy likewise requires the EEO officer to document all requests for reasonable accommodation and their outcomes, to track and report that data to DCAS, and to affirm quarterly that the data is current and accurately entered.

350. DCAS's own quarterly reports further confirm that all accommodation requests and dispositions are reported into the DCAS Citywide Complaint/Reasonable Accommodation Tracking System and CAD Database.

351. The ordinary-course accommodation records relevant to identifying class members and adjudicating class claims are within DCAS's possession, custody, and control and are readily accessible through centralized agency systems.

352. These records can be produced broken down by, among other grounds, fiscal year, disposition (approved, denied, etc.), types of disabilities reported, and types of accommodations sought/provided.

353. The putative class can be identified and quantified from those same objective agency records rather than from individualized recollection or informal estimates.

354. This centralized recordkeeping architecture materially supports Rule 23(a) commonality and numerosity.

355. The Permanent Disability Denial Class is properly alleged on a Citywide basis because the challenged duration-based disqualification is not an isolated DCAS personnel error. It arises from the City's centralized equal-employment and reasonable-accommodation architecture.

356. DCAS, through Citywide Equity and Inclusion ("CEI"), sets standards for City agencies to implement the City's EEO Policy, procedures, laws, and City mandates. CEI further provides guidance to agency EEO Officers across approximately eighty City entities and affects the entire 350,000-plus City workforce.

357. CEI's Citywide role includes guidance to agency EEO Officers on the Citywide EEO Policy, including the City's reasonable-accommodation process, monitoring legal developments, updating EEO policy and related processes, training City agency EEO professionals, maintaining compliance tools and reference resources, responding to agency consultation requests, and reviewing and approving agency EEO plans and quarterly updates.

358. The City's own EEO Policy confirms that DCAS's role is operational and Citywide. DCAS is required to establish uniform procedures and standards for City agencies in establishing measures, programs, and plans to ensure equal employment opportunity. The DCAS Commissioner is authorized to establish and enforce uniform procedures and standards for City agencies. Upon information and belief, CEI assists the DCAS Commissioner in developing the City's EEO Policy, standards, and procedures.

359. The City's Reasonable Accommodation Procedural Guidelines likewise apply Citywide and direct agency EEO officers to consult with CEI regarding questions about the reasonable-accommodation process. Those Guidelines do not create one rule for DCAS employees and another rule for other City employees. They state that accommodations are reasonable if they do not create an undue hardship or direct threat, and that the accommodation process must be flexible, interactive, individualized, meaningful, cooperative, and timely.

360. Against this Citywide structure, the central common question for the Permanent Disability Denial Class is whether Defendant City, through DCAS and CEI, may treat the permanent, indefinite, long-term, chronic, unknown-duration, or no-end-date nature of a disability or accommodation need as a disqualifying feature, a presumptive bar, or a proxy for undue hardship.

361. That question is common across agencies because it challenges the legality of a standard, practice, guidance position, and decision framework maintained by the City agency responsible for promulgating and enforcing uniform Citywide EEO and reasonable accommodation standards.

362. Commonality does not require that every class member have the same disability, job title, agency, requested accommodation, supervisor, or medical record. The Permanent Disability Denial Class turns on a common contention capable of a common answer: whether Defendant City's duration-based accommodation rule, presumption, practice, or guidance violates the Rehabilitation Act, ADA, NYSHRL, and NYCHRL because it substitutes a categorical duration limit for the individualized assessment required by law and by the City's own written policy.

363. The same common answer will determine the propriety of class-wide relief. A single injunction prohibiting Defendant City from treating permanent, indefinite, long-term, chronic, unknown-duration, or no-end-date disability accommodation needs as automatically or presumptively disqualifying would apply uniformly to all City agencies.

364. A single injunction requiring DCAS and CEI to revise Citywide guidance, retrain agency EEO Officers, correct tracking practices, and require individualized undue-hardship review would likewise benefit every member of the Permanent Disability Denial Class without requiring separate agency-by-agency injunctions.

365. Numerosity is also plausibly satisfied on a Citywide basis.

366. CEI publicly identifies the relevant workforce as the 350,000-plus City workforce. Applying the conservative 7.6 percent working-age disability rate already alleged in this Amended Complaint to a 350,000-employee workforce yields an estimated 26,600 City employees with

disabilities. Applying the already alleged 70.2 percent rate of workers with disabilities who reported requesting accommodations yields approximately 18,673 City employees who likely requested a workplace accommodation. Applying the already alleged 50 percent rate of accommodation requests that were not fully implemented yields approximately 9,337 denied or partially denied accommodation requests.

367. Plaintiff does not allege that every disabled City employee, every City employee who requested an accommodation, or every City employee whose accommodation was denied is a member of the Permanent Disability Denial Class. The class is narrower. It includes only those current City employees whose disability accommodation requests were denied or not approved, in whole or in part, because of the permanent, indefinite, long-term, chronic, unknown-duration, or no-end-date nature of the disability or requested accommodation. But only one-half of one percent of the estimated 9,337 denied or partially denied Citywide accommodation requests would yield approximately forty-seven class members, which is enough to make joinder impracticable under Rule 23(a)(1).

368. The inference of numerosity is further supported by the City's own standardized accommodation records. The City's reasonable-accommodation process requires written accommodation requests, written determinations, recordkeeping regarding decisions and appeals, and tracking of requests and outcomes. The City's own procedures and reporting architecture therefore make the class identifiable by objective criteria, including the request form, medical or functional-limitations documentation, written determination, stated reason for denial or non-approval, appeal materials, disposition fields, disability type, accommodation type, and the Citywide Complaint/Reasonable Accommodation Tracking System and CAD Database.

369. Defendant City is in exclusive or superior possession of the records necessary to identify the exact number of Permanent Disability Denial Class members. Those records can be produced and analyzed by agency, fiscal year, disposition, disability type, accommodation requested, accommodation denied or not approved, whether the condition or accommodation was recorded as permanent, temporary, unknown, long-term, indefinite, or lacking a fixed end date, and the stated reason for denial or non-approval. Because the relevant proof is maintained in standardized City systems, the Citywide Permanent Disability Denial Class is not speculative, unmanageable, or dependent on individualized recollection.

370. For these reasons, the Permanent Disability Denial Class satisfies Rule 23(a)(1) and Rule 23(a)(2), and certification under Rule 23(b)(2) is appropriate because Defendant City has acted or refused to act on grounds generally applicable to the class. The requested relief is indivisible and prospective: a declaration that duration-based categorical denials violate the governing disability laws, and an injunction requiring Defendant City to administer accommodation requests through lawful, individualized, Citywide procedures.

371. Upon information and belief, Silvia Montalban, Esq. ("Montalban") is the City's Deputy Commissioner and Chief Citywide Equity and Inclusion Officer within DCAS.

372. Upon information and belief, in that role, Montalban is not merely a DCAS line employee or agency-level human resources official. She is a senior Citywide EEO policymaker whose office assists the DCAS Commissioner in developing the City's EEO Policy, standards, and procedures, and whose office sets standards for City agencies to implement the City's EEO Policy, procedures, laws, and City mandates.

373. Upon information and belief, CEI's Citywide functions include providing guidance to agency EEO officers concerning the Citywide EEO Policy and the City's reasonable-

accommodation process, monitoring legal developments, updating EEO policy and related processes, developing Citywide EEO and non-discrimination training, organizing mandatory Citywide EEO best-practices meetings and professional-development programs for EEO professionals, maintaining compliance tools and reference resources, responding to agency consultation requests, and reviewing agency EEO plans and quarterly updates.

374. Upon information and belief, because of Montalban's role, statements, guidance, training, and expressed enforcement priorities by Montalban or CEI concerning disability accommodations are reasonably understood by agency EEO officers and human resources personnel as Citywide direction regarding how disability-accommodation requests should be evaluated, documented, processed, approved, denied, or escalated.

375. Upon information and belief, during an annual or periodic Citywide meeting of agency EEO officers, human resources personnel, and related City personnel in or about 2023 or 2024, Montalban led, spoke at, or materially participated in a discussion concerning Citywide disability-accommodation guidance, practice, and procedure.

376. Upon information and belief, that meeting was convened in whole or in part for Citywide EEO officers, HR personnel, and related City personnel across City agencies, and therefore was the type of meeting through which CEI communicates Citywide EEO expectations, guidance, and enforcement priorities.

377. Upon information and belief, during that Citywide meeting, Montalban, in sum and substance, expressed and/or implied skepticism toward disability-accommodation requests by City employees, including the view, assumption, or concern that many disability-accommodation requests were unmeritorious, abusive, or made in bad faith.

378. Upon information and belief, Montalban's remarks communicated to agency EEO officers and human resources personnel that disability-accommodation requests should be viewed with skepticism rather than through the individualized, flexible, good-faith assessment required by law and by the City's own written policies.

379. Upon information and belief, this communicated and/or implied skepticism was not limited to any one agency, employee, supervisor, job title, or disability. It was communicated in a Citywide EEO setting to the personnel responsible for processing, advising on, documenting, and implementing disability-accommodation requests across City agencies.

380. Upon information and belief, Montalban's comments reflected and reinforced a Citywide culture within the City's EEO infrastructure in which disability-accommodation requests, including requests by employees with permanent, long-term, chronic, indefinite, unknown-duration, or no-end-date disabilities, were treated as suspect, excessive, abusive, or presumptively disfavored.

381. Upon information and belief, this Citywide presumption helps explain why Defendant City and DCAS treated Plaintiff's long-term remote-work accommodation as inherently suspect despite years of successful remote performance, prior approvals, and an express May 9, 2023 finding that remote work with site visits did not impose an undue hardship.

382. Upon information and belief, this Citywide presumption also helps explain why DCAS and City agencies would repeatedly require employees with permanent, long-term, chronic, indefinite, unknown-duration, or no-end-date disabilities to re-prove their disabilities and accommodation needs, even where the City already possessed sufficient medical information and the accommodation had previously been found effective.

383. The City's own written reasonable-accommodation guidance requires a flexible, interactive, individualized, meaningful, cooperative, and timely process.

384. A Citywide EEO leadership message and/or implication that disability-accommodation requests are frequently unmeritorious, abusive, or bad faith is inconsistent with that individualized process because it encourages decisionmakers to begin from suspicion rather than from an objective assessment of functional limitations, essential requisites, effective accommodations, direct threat, and undue hardship.

385. Upon information and belief, the communicated skepticism is also probative of commonality under Rule 23(a)(2). Plaintiff and the Permanent Disability Denial Class do not challenge isolated mistakes by separate supervisors. They challenge a Citywide accommodation framework in which the City's central EEO leadership communicated and/or implied skepticism toward disability-accommodation requests and Defendant City applied that skepticism through categorical or presumptive limits on permanent, long-term, chronic, indefinite, unknown-duration, or no-end-date accommodations.

386. Upon information and belief, French personally handled, or was significantly involved in, most, if not all, disability-accommodation requests submitted to DCAS during the class period as the sole decisionmaker in her capacity as EEO Officer and Disability Rights Coordinator.

387. Upon information and belief, French has occupied one or both of these roles, or similar role(s), from at least approximately April 2022 until the present.

388. Plaintiff has no conflicts with the members of the Classes.

389. Plaintiff seeks class certification under Rule 23(b)(2) for declaratory and injunctive relief only. Plaintiff does not seek individualized monetary relief on behalf of the Class through the Rule 23(b)(2) class claims.

390. The Classes seek only prospective declaratory and injunctive relief.

391. Plaintiff's individualized monetary claims are asserted solely on Plaintiff's own behalf and can be adjudicated separately from the class-wide claims for prospective relief without compromising the interests of the Classes.

392. Plaintiff has retained counsel experienced in employment class actions and is capable of vigorously prosecuting this action, including the class-wide claims for declaratory and injunctive relief.

393. Counsel will fairly and adequately represent the Class.

394. Class certification is appropriate under Fed. R. Civ. P. 23(b)(2) because Defendant City has acted and/or refused to act on grounds generally applicable to the Classes by maintaining and applying the challenged policies, practices and/or procedures, and/or standard operating procedures.

395. Declaratory and injunctive relief is therefore appropriate with respect to the Classes as a whole because a single injunction or declaration would provide relief to each class member, including by: (1) prohibiting categorical duration-based disability accommodation denials and requiring lawful individualized assessment; (2) prohibiting retaliation against disabled employees seeking remote work accommodations; and/or (3) prohibiting unnecessary duplicative requests for medical documents to support the continuation of previously granted accommodations going forward.

396. Certification is also appropriate under Rule 23(c)(4) with respect to any or all of the common issues identified above.

397. The relief sought on a class-wide basis is indivisible and would benefit Plaintiff and all Classes alike.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Failure to Reasonably Accommodate in Violation of the Rehabilitation Act**
**(By Plaintiff and the Permanent Disability Denial Class Against Defendant City)**

398. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

399. Defendant City is subject to Section 504 of the Rehabilitation Act because it receives federal financial assistance.

400. Plaintiff has a disability and physical impairment -- a chronic respiratory illness and multiple pulmonary conditions requiring strict ongoing medical treatment -- that substantially limits one or more major life activities, including breathing and respiratory function.

401. Defendant City had actual knowledge of Plaintiff's disability at all times from May 2021 to the present.

402. Plaintiff was qualified for his DCAS position and could perform the essential functions or essential requisites of the position with or without a reasonable accommodation, including full-time remote work and discrete site visits when assigned and medically feasible.

403. Full-time remote work was reasonable because Plaintiff successfully performed remotely for years, DCAS previously approved that accommodation, and DCAS stated that remote work with site visits imposed no undue hardship to the agency on May 9, 2023.

404. Defendant City denied Plaintiff's reasonable accommodation requests.

405. Defendant City denied, restricted, delayed, terminated, or failed to continue Plaintiff's full-time remote-work accommodation, including, without limitation, based on generalized undue-hardship assertions, asserted site-visit barriers, and the permanent, long-term, indefinite, or no-end-date nature of the disability or requested accommodation.

406. Defendant City also failed to accommodate Plaintiff by denying the requested accommodation on the ground that it was not absolutely necessary. The Rehabilitation Act, ADA, and NYCHRL require reasonable accommodations, not only accommodations without which work is impossible. Plaintiff remained qualified because he could perform the essential functions of his position with or without reasonable accommodation, and the requested accommodation was reasonable because it would mitigate Plaintiff's disability-related limitations, treatment-regimen burdens, health risks, and office-attendance barriers while allowing him to perform the job.

407. Defendant City failed to engage in a good-faith interactive process, including, without limitation, by: (i) refusing to engage in meaningful dialogue about Plaintiff's specific limitations and needs; (ii) refusing to consider alternatives or modifications; (iii) issuing denials based on conclusory assertions without individualized assessment; (iv) denying accommodation requests in as little as seventeen minutes without any review; (v) treating his technical ability to leave his home, with his breathing apparatus, as an indication his disability accommodation was meritless and not necessary; and (vi) implementing a blanket policy against permanent or indefinite accommodations regardless of medical necessity or reasonableness.

408. As a direct and proximate result of Defendant City's refusal to provide Plaintiff with a reasonable accommodation and failure to engage in the interactive process, Plaintiff has suffered damages.

409. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, but was told by DCAS that he needed to return to work "full duty" and/or "without restrictions" and has otherwise not been approved to return to work.

410. Plaintiff has alternatively requested to return to work in-person with in-person accommodations of his disability but has been prohibited from returning to work.

411. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, or in the alternative, left with no other option, to return to work with an in-person accommodation, but was told by DCAS that he needed to return to work "full duty" and/or "without restrictions," and has otherwise not been permitted to return to work.

412. It was DCAS's policy, pattern and/or practice, and/or standard operating procedure to deny, in whole or in part, or not approve, in whole or in part, disability accommodation requests based on the permanent, long-term, unknown duration, and/or indefinite nature of the disability, and/or the permanent, long-term, and/or indefinite nature of the requested accommodation.

413. These acts violated the statutory rights of Plaintiff and the Permanent Disability Denial Class.

414. Plaintiff and the Permanent Disability Denial Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the Rehabilitation Act.

**SECOND CAUSE OF ACTION**
**Disability Discrimination in Violation of the Rehabilitation Act**
**(By Plaintiff Against Defendant City)**

415. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

416. Defendant City is subject to Section 504 of the Rehabilitation Act because it receives federal financial assistance.

417. Plaintiff has a disability, Defendant City had actual knowledge of that disability, and Plaintiff was qualified for his position with or without reasonable accommodation.

418. Defendant City discriminated against Plaintiff because of disability by, among other things, demoting him shortly after his September 2022 accommodation request, denying and restricting full-time remote work, forcing leave usage, marking or threatening AWOL, revoking approved vacation and telework, placing him on involuntary FMLA or medical leave, requiring a Section 72 examination, and advancing disciplinary theories arising from the accommodation period.

419. Defendant City also treated Plaintiff less favorably than non-disabled employees who received telework flexibility of two days of remote work a week while he was forced onto an involuntary leave and provided with no remote work days.

420. DCAS denied Plaintiff's requests for an accommodation including based on his permanent disability and/or for his permanent disability and/or permanent disability accommodation.

421. As a direct and proximate result of Defendant City's discriminatory actions, Plaintiff suffered damages and is entitled to all individual relief available under the Rehabilitation Act.

**THIRD CAUSE OF ACTION**
**Retaliation in Violation of the Rehabilitation Act**
**(By Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**

422. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

423. Plaintiff and the Remoted Work Request Retaliation Class and Medical Inquiry Class engaged in protected activity, including but not limited to, by requesting, renewing, supplementing, appealing, and opposing denials of disability-based accommodations.

424. Plaintiff also engaged in additional protected activity that included, but was not limited to, filing NYSDHR complaints, retaining counsel to assert his disability rights, having his counsel send correspondence asserting his protected rights, and commencing this action.

425. Defendant City knew of this protected activity and took materially adverse actions that would dissuade a reasonable employee from exercising accommodation rights.

426. Those materially adverse actions included, among others, Plaintiff's September 2022 demotion, the seventeen-minute denial of his May 19, 2025 accommodation request after the May 2025 NYSDHR retaliation complaint, forced leave usage, refusal to continue interim telework, AWOL designation, revocation of leave and telework, Section 72 scheduling, involuntary FMLA or medical leave, automatic denial of later accommodation requests, repeatedly asking him to submit unnecessary and duplicative additional medical documents, false and pretextual disciplinary charges, denial of his requested June 25, 2025 foot disability accommodation, charges seeking termination through the charging process after this action was filed, and full-duty return demands.

427. Those materially adverse actions also included DCAS's March 28, 2026 public-facing service of the disciplinary charges at Plaintiff's home, after the same charges had already

been provided through multiple less intrusive channels, by taping the charges directly to Plaintiff's front door in plain view, photographing the papers, and leaving them exposed.

428. Plaintiff's September 2022 demotion also contributed to the retaliation-based hostile work environment alleged below.

429. The causal connection is supported by temporal proximity and escalating adverse actions after protected activity.

430. The timing and manner of the March 28, 2026 home service further supports an inference of retaliatory intent and causation, because it occurred twelve days after Plaintiff filed this federal lawsuit and after DCAS had already provided the same charges through multiple less intrusive methods. The unnecessary public exposure of charges containing serious disciplinary and criminal accusations would dissuade a reasonable employee from continuing to request accommodations, oppose discrimination, pursue administrative remedies, or prosecute a disability-rights lawsuit.

431. Defendant City's explanations for the adverse actions were pretextual, shifting explanations, and contradicted by its own prior positions and documentation.

432. Defendant City retaliated against the Remote Work Request Retaliation Class by taking materially adverse actions against them within seventy-five days after the request, renewal, supplement, or appeal of their disability-based remote work accommodation request.

433. Defendant City retaliated against the Medical Inquiry Class by instructing them to submit unnecessary duplicative additional medical documents concerning their permanent and/or long-term disability, in support of their previously granted disability-based remote work accommodation requests, and beyond the documents supported by a job-related and/or business necessity.

434. Since, at least approximately September 1, 2022, it was the City's policy, pattern and/or practice, and/or standard operating procedure to retaliate against employees who requested disability-based remote work accommodations.

435. Since, at least approximately September 1, 2022, the City further created a retaliation-based hostile work environment for Plaintiff and the Remote Work Request Retaliation Class. For Plaintiff, that hostile work environment included, without limitation, the September 2022 demotion, which removed him from the senior management team, placed him in a subordinate Project Manager role, and gave DCAS a later basis to pretextually contend that site visits barred full-time remote work.

436. The retaliatory hostile work environment was sufficiently severe and/or pervasive to alter the conditions of their employment.

437. Retaliation against the Medical Inquiry Class and the Remote Work Request Retaliation Class was Defendant City's standard operating procedure.

438. These acts violated the statutory rights of the Remote Work Request Retaliation Class and the Medical Inquiry Class.

439. As a direct and proximate result of Defendant City's retaliation, Plaintiff has suffered damages.

440. Plaintiff and the Medical Inquiry Class and the Remote Work Request Retaliation Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the Rehabilitation Act

**<u>FOURTH CAUSE OF ACTION</u>**
**Interference with Rights Under the Rehabilitation Act**
**(By Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**

441. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

442. In employment-discrimination cases under Section 504, the Rehabilitation Act expressly incorporates the standards applied under Title I of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq*., and the employment-related provisions of ADA §§ 501 through 504 and 510, including ADA § 503, codified at 42 U.S.C. § 12203. 29 U.S.C. § 794(d).

443. ADA § 503 makes it unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of rights granted or protected by the ADA. 42 U.S.C. § 12203(b).

444. Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class exercised and sought to exercise rights granted or protected by the Rehabilitation Act and ADA by, among other ways, requesting reasonable accommodations, renewing or continuing previously approved accommodations, appealing denials or restrictions of accommodations, and opposing disability discrimination and retaliation.

445. Those rights include the right to reasonable accommodation absent undue hardship, the right not to be denied employment opportunities because of the need for accommodation, the right to oppose unlawful disability discrimination, and the right to exercise or enjoy disability-accommodation rights free from coercion, intimidation, threats, or interference. 29 U.S.C. § 794(d). 42 U.S.C. §§ 12112(b)(5)(A)-(B), 12203(a)-(b).

446. Defendant City interfered with those rights by, among other things, using unnecessary medical-document demands, end-date and return-to-office demands, refusal to

maintain interim accommodations, forced leave, AWOL threats or designations, compulsory medical examinations, discipline, bringing criminally framed charges, seeking the charge relief of termination after this case was filed, and other pressure to chill or burden accommodation activity.

447. As to Plaintiff, Defendant City also, among other things, changed his reporting structure, manipulated or changed his essential functions, revoked telework, restricted his ability to work, advanced discipline, and used leave and medical processes as leverage instead of providing an effective accommodation.

448. Defendant City's conduct was intentional and had the purpose or effect of interfering with protected rights and a reasonable tendency to coerce or intimidate employees seeking accommodations.

449. Defendant City further interfered with Plaintiff's Rehabilitation Act rights by using pending disciplinary charges, the threat of termination or resignation, and the possibility of a more favorable disciplinary outcome if Plaintiff dismissed this lawsuit, to pressure Plaintiff to dismiss this lawsuit and return to ordinary telework "as a normal employee," rather than continue pursuing his disability-accommodation rights.

450. This conduct clearly tied Plaintiff's protected activity, or continued pursuit of his protected activity, to the filing, continued prosecution, and/or requested remedy of his termination.

451. This conduct constituted coercion, intimidation, threat, and/or interference with Plaintiff's protected disability rights.

452. Defendant City further interfered with Plaintiff's Rehabilitation Act rights by causing or permitting disciplinary charges that included serious disciplinary and criminal accusations to be taped directly to Plaintiff's front door in plain view, even though DCAS already had provided the same charges through multiple less intrusive channels. That method of service

was unnecessary to provide notice and had a reasonable tendency to intimidate Plaintiff, invade his privacy, expose him to embarrassment and reputational pressure, and chill his continued exercise of accommodation, opposition, administrative charge, and litigation rights.

453. Under all the existing circumstances, the conduct had a reasonable tendency to coerce or intimidate employees regardless of whether they are actually coerced.

454. As a direct and proximate result of Defendant City's interference, intimidation, coercion, and/or threats in violation of the Rehabilitation Act, Plaintiff has suffered damages.

455. These acts violated the statutory rights of Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class.

456. As a direct and proximate result of Defendant's interference, Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class have been coerced, intimidated, threatened, and denied disability accommodations or the fair exercise of their accommodation rights protected by law.

457. Plaintiff, and the Remote Work Request Retaliation Class and Medical Inquiry Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the Rehabilitation Act.

## FIFTH CAUSE OF ACTION
**Medical Inquiry Violation Under the Rehabilitation Act**
**(By Plaintiff and the Medical Inquiry Class Against Defendant City)**

458. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

459. The Rehabilitation Act prohibits disability-related inquiries and medical examinations unless they are job-related and consistent with business necessity.

460. Defendant City demanded medical information from Plaintiff beyond what was necessary, including updated diagnosis or prognosis, return-to-work projections, a date for full return to work, and unnecessary documentation formalities, even though Plaintiff had already provided sufficient medical documentation and DCAS had previously approved the accommodation.

461. Defendant City further required Plaintiff to undergo a Section 72 fitness-for-duty or independent medical examination without objective evidence showing that Plaintiff could not perform the essential functions of his job with an accommodation or posed a direct threat.

462. Upon information and belief, Defendant City also disclosed, disseminated, or failed to maintain Plaintiff's medical and accommodation information as confidential to the extent alleged above.

463. Defendant City also maintained and/or applied a policy, pattern, practice, and/or standard operating procedure of demanding unnecessary additional medical documentation concerning permanent, long-term, and/or chronic conditions, including repeated requests for updated diagnoses or prognoses, return-to-work projections, and similar recertification materials despite the sufficiency of documentation already provided.

464. Defendant City violated 42 U.S.C. § 12112(d)(4)(A), as incorporated by the Rehabilitation Act, by making unlawful disability-related inquiries and by requiring an unlawful medical examination that was not job-related and consistent with business necessity regarding Plaintiff and the Medical Inquiry Class.

465. As a direct and proximate result of Defendant City's violations of 42 U.S.C. § 12112(d)(4)(A), Plaintiff has suffered damages.

466. Plaintiff and the Medical Inquiry Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the Rehabilitation Act.

**SIXTH CAUSE OF ACTION**
**Failure to Reasonably Accommodate in Violation of the ADA**
**(By Plaintiff and the Permanent Disability Denial Class Against Defendant City)**

467. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

468. Plaintiff has a disability and physical impairment -- a chronic respiratory respiratory illness and multiple pulmonary conditions requiring strict, ongoing medical treatment -- that substantially limits one or more major life activities, including breathing and respiratory function.

469. Defendant City had actual knowledge of Plaintiff's disability at all times from May 2021 to the present.

470. Plaintiff was qualified for his DCAS position and could perform the essential functions or essential requisites of the position with or without a reasonable accommodation, including full-time remote work and discrete site visits when assigned and medically feasible.

471. Full-time remote work was reasonable including because Plaintiff successfully performed remotely for years, DCAS previously approved that accommodation, and DCAS stated that remote work with site visits imposed no undue hardship to the agency on May 9, 2023.

472. Defendant City denied Plaintiff's reasonable accommodation requests.

473. Defendant City denied, restricted, delayed, terminated, or failed to continue Plaintiff's full-time remote-work accommodation based on generalized undue-hardship assertions, asserted site-visit barriers, and/or the permanent, long-term, indefinite, or no-end-date nature of the disability or requested accommodation.

474. Defendant City failed to engage in a good-faith interactive process, including without limitation, by: (i) refusing to engage in meaningful dialogue about Plaintiff's specific limitations and needs; (ii) refusing to consider alternatives or modifications; (iii) issuing denials based on conclusory assertions without individualized assessment; (iv) denying accommodation requests in as little as seventeen minutes without any review; (v) treating his technical ability to leave his home, with his breathing apparatus, as an indication his disability accommodation was meritless and not necessary; and (vi) implementing a blanket policy against permanent or indefinite accommodations regardless of medical necessity or reasonableness.

475. As a direct and proximate result of Defendant City's refusal to provide Plaintiff with a reasonable accommodation and failure to engage in the interactive process, Plaintiff has suffered damages.

476. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, but was told by DCAS that he needed to return to work "full duty" and/or "without restrictions" and has otherwise not been approved to return to work.

477. Plaintiff has alternatively requested to return to work in-person with in-person accommodations of his disability but has been prohibited from returning to work.

478. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, or in the alternative, left with no other option, to return to work with an in-person accommodation, but was told by DCAS that he needed to return to work "full duty" and/or "without restrictions," and has otherwise not been permitted to return to work.

479. It was DCAS's policy, pattern and/or practice, and/or standard operating procedure to deny, in whole or in part, or not approve, in whole or in part, disability accommodation requests based on the permanent, long-term, unknown duration, and/or indefinite nature of the disability, and/or the permanent, long-term, and/or indefinite nature of the requested accommodation.

480. These acts violated the statutory rights of Plaintiff and the Permanent Disability Denial Class.

481. Plaintiff and the Permanent Disability Denial Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the ADA.

## SEVENTH CAUSE OF ACTION
**Disability Discrimination in Violation of the ADA**
**(By Plaintiff Against Defendant City)**

482. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

483. Plaintiff has a disability, Defendant City had actual knowledge of that disability, and Plaintiff was qualified for his position with or without reasonable accommodation.

484. Defendant City discriminated against Plaintiff because of disability by, among other things, demoting him shortly after his September 2022 accommodation request, denying and restricting full-time remote work, forcing leave usage, marking or threatening AWOL, revoking approved vacation and telework, placing him on involuntary FMLA or medical leave, requiring a Section 72 examination, and advancing disciplinary theories arising from the accommodation period.

485. Defendant City also treated Plaintiff less favorably than non- employees who received telework flexibility through two of remote work each week, while DCAS denied

Plaintiff's requests for an accommodation for his permanent disability and/or permanent disability accommodation.

486. Kazior's April 30, 2026 statement that Plaintiff could avoid termination or resignation only if he returned under ordinary telework "as a normal employee" further supports an inference that Defendant City treated Plaintiff less favorably because he had a disability and/or required a disability-based accommodation.

487. As a direct and proximate result of Defendant City's discriminatory actions, Plaintiff suffered damages and is entitled to all individual relief available under the ADA.

**EIGHTH CAUSE OF ACTION**
**Retaliation in Violation of the ADA**
**(By Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**

488. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

489. Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class engaged in protected activity by requesting, renewing, supplementing, appealing, and opposing denials of disability-based accommodations.

490. Plaintiff also filed NYSDHR complaints, retained counsel, and commenced this action.

491. Defendant City knew of this protected activity and took materially adverse actions that would dissuade a reasonable employee from exercising accommodation rights.

492. Those materially adverse actions included, among others, Plaintiff's September 2022 demotion, the seventeen-minute denial of his May 19, 2025 accommodation request after the May 2025 NYSDHR retaliation complaint, forced leave usage, refusal to continue interim telework, AWOL designation, revocation of leave and telework, Section 72 scheduling,

involuntary FMLA or medical leave, automatic denial of later accommodation requests, repeatedly asking him to submit unnecessary and duplicative additional medical documents, false and pretextual disciplinary charges, denial of his requested June 25, 2025 foot disability accommodation, charges seeking termination through the charging process after this action was filed, and full-duty return demands, and full-duty return demands.

493. Plaintiff's September 2022 demotion also began and contributed to the retaliation-based hostile work environment alleged herein.

494. Those adverse actions also included DCAS's March 28, 2026 public-facing service of the disciplinary charges at Plaintiff's home, after the same charges had already been provided through multiple less intrusive channels, by taping the charges directly to Plaintiff's front door in plain view, photographing the papers, and leaving them exposed.

495. The causal connection is supported by temporal proximity and escalating adverse actions after protected activity.

496. The timing and manner of the March 28, 2026 home service further support intent and causation because it occurred twelve days after Plaintiff filed this federal lawsuit and after DCAS had already provided the same charges through multiple less intrusive methods. The unnecessary public exposure of charges containing serious disciplinary and criminal accusations would dissuade a reasonable employee from continuing to request accommodations, oppose discrimination, pursue administrative remedies, or prosecute a disability-rights lawsuit.

497. Defendant City's explanations for the adverse actions were pretextual, shifting explanations, and contradicted by its own prior positions and documentation.

498. Defendant City retaliated against the Remote Work Request Retaliation Class by taking materially adverse actions against them within seventy-five days after their request, renewal, supplement, or appeal of their disability-based remote work accommodation request.

499. Defendant City retaliated against the Medical Inquiry Class by instructing them to submit unnecessary duplicative additional medical documents concerning their permanent and/or long-term disability, in support of their previously granted disability-based remote work accommodation requests, and beyond the documents supported by a job-related and/or business necessity.

500. Since, at least approximately September 1, 2022, it was the City's policy, pattern and/or practice, and/or standard operating procedure to retaliate against employees who requested disability-based remote work accommodations.

501. Since, at least approximately September 1, 2022, the City further created a retaliation-based hostile work environment for Plaintiff and the Remote Work Request Retaliation Class. For Plaintiff, that hostile work environment included the September 2022 demotion, which removed him from the senior management team, placed him in a subordinate Project Manager role, and gave DCAS a later basis to pretextually contend that site visits barred full-time remote work

502. The retaliatory hostile work environment was sufficiently severe and/or pervasive to alter the conditions of their employment.

503. Retaliation against the Medical Inquiry Class and the Remote Work Request Retaliation Class was Defendant City's standard operating procedure.

504. These acts violated the statutory rights of the Remote Work Request Retaliation Class and the Medical Inquiry Class.

505. As a direct and proximate result of Defendant City's retaliation, Plaintiff has suffered damages.

506. Plaintiff and the Medical Inquiry Class and the Remote Work Request Retaliation Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the ADA.

## NINTH CAUSE OF ACTION
**Interference with Rights Under the ADA**
**(By Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**

507. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

508. Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class exercised and sought to exercise protected rights by, among other ways, requesting disability accommodations, continuing previously approved accommodations, appealing denials, and opposing disability discrimination and retaliation.

509. Defendant City interfered with those rights by, among other things, using unnecessary medical-document demands, end-date and return-to-office demands, refusal to maintain interim accommodations, forced leave, AWOL threats or designations, compulsory medical examinations, discipline, bringing criminally framed charges, seeking the charge relief of termination after this case was filed, and other pressure to chill or burden accommodation activity.

510. As to Plaintiff, Defendant City also, among other things, changed his reporting structure, manipulated or changed his essential functions, revoked telework, restricted his ability to work, advanced discipline, and used leave and medical processes as leverage instead of providing an effective accommodation.

511. Defendant City's conduct was intentional and had the purpose or effect of interfering with protected rights and a reasonable tendency to coerce or intimidate employees seeking accommodations.

512. Defendant City further interfered with Plaintiff's ADA rights by linking discipline, threatened termination or resignation, and any materially more favorable resolution of the charges to Plaintiff's dismissal of this lawsuit and return without his requested disability accommodation. This conduct constituted coercion, intimidation, threat, and interference under 42 U.S.C. § 12203(b).

513. Defendant City further interfered with Plaintiff's ADA rights by causing or permitting disciplinary charges that included serious disciplinary and criminal accusations to be taped directly to Plaintiff's front door in plain view, even though DCAS already had provided the same charges through multiple less intrusive channels. That method of service was unnecessary to provide notice and had a reasonable tendency to intimidate Plaintiff, invade his privacy, expose him to embarrassment and reputational pressure, and chill his continued exercise of accommodation, opposition, administrative-charge, and litigation rights.

514. Under all the existing circumstances, the conduct had a reasonable tendency to coerce or intimidate employees regardless of whether they are actually coerced.

515. As a direct and proximate result of Defendant City's interference, intimidation, coercion, and threats in violation of the ADA, Plaintiff has suffered damages.

516. These acts violated the statutory rights of Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class.

517. As a direct and proximate result of Defendant City's interference, Plaintiff, the Remote Work Request Retaliation Class, and the Medical Inquiry Class have been coerced,

intimidated, threatened, and denied disability accommodations or the fair exercise of their accommodation rights protected by law.

518. Plaintiff and the Remote Work Request Retaliation Class and Medical Inquiry Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the ADA.

## TENTH CAUSE OF ACTION
**Medical Inquiry Violation Under the ADA**
**(By Plaintiff and the Medical Inquiry Class Against Defendant City)**

519. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

520. Defendant City demanded medical information from Plaintiff beyond what was necessary, including updated diagnosis or prognosis, return-to-work projections, a date for full return to work, and unnecessary documentation formalities, even though Plaintiff had already provided sufficient medical documentation and DCAS had previously approved the an accommodation and/or despite his permanent, long-term, and/or chronic condition.

521. Defendant City further required a Section 72 fitness-for-duty or independent medical examination without objective evidence showing that Plaintiff could not perform the essential functions with accommodation or posed a direct threat.

522. Defendant City also disclosed, disseminated, or failed to maintain Plaintiff's medical and accommodation information as confidential to the extent alleged above.

523. Defendant City also maintained and/or applied a policy, pattern, practice, and/or standard operating procedure of demanding unnecessary additional medical documentation concerning permanent, long-term, and/or chronic conditions, including repeated requests for

updated diagnoses or prognoses, return-to-work projections, and similar recertification materials despite the sufficiency of documentation already provided.

524. Defendant City violated 42 U.S.C. § 12112(d)(4)(A) by making unlawful disability-related inquiries and by requiring an unlawful medical examination that was not job-related and consistent with business necessity regarding Plaintiff and the Medical Inquiry Class.

525. As a direct and proximate result of Defendant City's violations of 42 U.S.C. § 12112(d)(4)(A), Plaintiff has suffered damages

526. Plaintiff and the Medical Inquiry Class are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the ADA.

## ELEVENTH CAUSE OF ACTION
**Interference with Rights Under the FMLA**
**(Failure to Provide Timely Notice, Prejudicial Late Designation and Use of FMLA Leave as a Lesser Substitute for Disability Accommodation)**
**(By Plaintiff Against Defendant City)**

527. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

528. At all relevant times, Plaintiff was an eligible employee under the FMLA, Defendant City was a covered employer, and Plaintiff had a serious health condition requiring continuing treatment by a health care provider.

529. On or about September 12, 2025, Defendant City designated Plaintiff's leave as FMLA leave without having previously provided required eligibility, rights and responsibilities, and designation notices within the time required by 29 C.F.R. § 825.300(b)-(d), and after DCAS had already denied, restricted, or refused to continue the disability-based remote-work accommodation that would have allowed Plaintiff to continue working.

530. Plaintiff and his counsel did not request FMLA leave. DCAS instead forced Plaintiff to use leave after denying the disability-based remote-work accommodation that would have allowed him to continue working, then treated that forced leave usage as a basis to place him on FMLA leave.

531. Under 29 C.F.R. § 825.702(a)-(b), Defendant City was required to analyze Plaintiff's FMLA rights and disability-accommodation rights separately, comply with both statutory schemes, and provide Plaintiff with the greater available protection.

532. If Plaintiff could perform the essential functions and essential requisites of his position with reasonable accommodation, then forced leave was not the greater right as an alternative to a work-enabling disability accommodation.

533. Defendant City violated this requirement by using FMLA leave, sick leave, medical leave, unpaid leave, and a return-or-resign deadline as substitutes for the reasonable accommodation that would have allowed Plaintiff to remain actively employed and continue performing his job.

534. Defendant City's untimely and unilateral FMLA designation prejudiced Plaintiff by depriving him of the opportunity to make the most effective and informed leave decisions and/or obtain maximum FMLA leave protections, including by retroactively characterizing forced leave and AWOL issues as FMLA leave, failing to protect him from or avoid having been marked AWOL as opposed to being on a protected FMLA leave during the period he was marked AWOL, reducing the amount of protected FMLA leave available to him, and using FMLA leave as the lesser substitute for the greater disability-accommodation protection that would have allowed him to continue working.

535. Defendant City's conduct interfered with, restrained, and denied Plaintiff's FMLA rights and caused damages including leave depletion, lost income or threatened income loss, loss or threatened loss of benefits and job protection, loss of informed leave planning, loss of active employment status, loss of the greater statutory protection available through reasonable accommodation, and related monetary and equitable harm.

536. Under all the existing circumstances, the conduct had a reasonable tendency to coerce or intimidate employees regardless of whether they are actually coerced.

537. Defendant City's conduct was willful.

538. Defendant's conduct was not good faith compliance with the FMLA.

539. Plaintiff is entitled to all individual relief available under the FMLA.

## TWELFTH CAUSE OF ACTION
**Disparate Treatment Disability Discrimination Under NYSHRL**
**(By Plaintiff Against Defendant City)**

540. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

541. Plaintiff had a disability under the NYSHRL, Defendant City knew or should have known of that disability, Plaintiff was qualified for his position, and Plaintiff could perform his job with reasonable accommodation.

542. Defendant City discriminated against Plaintiff in the terms, conditions, and privileges of employment because of his disability by, among other ways, denying, restricting, and terminating remote work, forcing leave, marking or threatening AWOL, revoking telework, using medical and leave processes, and advancing discipline.

543. Among other reasons, a discriminatory inference arises from DCAS's reliance on Plaintiff's disability-related limitations, its duration-based accommodation rationales, its treatment

of his continuing accommodation need as a reason to deny him an accommodation, its shifting explanations, its departures from prior approvals, Plaintiff's prior successful remote performance, and DCAS's escalation after he engaged in accommodation-based protected activity.

544. Defendant City also treated Plaintiff less favorably than non-disabled employees who received telework flexibility through two remote work days each week.

545. DCAS denied Plaintiff's requests for disability accommodation based remote work, and instead, put him on an involuntary leave during which he was provided no remote work days each week.

546. Kazior's April 30, 2026 statement that Plaintiff could avoid termination or resignation only if he returned under ordinary telework "as a normal employee" further supports an inference that Defendant City treated Plaintiff less favorably because he had a disability and/or required a disability-based accommodation.

547. As a direct and proximate result of Defendant City's discriminatory conduct, Plaintiff suffered damages.

548. Plaintiff is entitled to all relief available to him under the NYSHRL.

**<u>THIRTEENTH CAUSE OF ACTION</u>**
**Aiding, Abetting, Inciting, Compelling, Coercing, and/or Attempting to Do So Under NYSHRL**
**(By Plaintiff Against All Individual Defendants)**

549. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

550. Defendant City violated the NYSHRL by, among other things, discriminating and retaliating against Plaintiff because of his disability, accommodation requests, accommodation appeals, protected opposition, administrative filings, and this lawsuit.

551. As alleged above, each Individual Defendant was a person within the meaning of N.Y. Exec. Law § 296(6), knew of Plaintiff disability and protected activity, and aided, abetted, incited, compelled, or coerced Defendant City or each other's violations of NYSHRL, or attempted to do so.

552. The Individual Defendants actually participated in the discrimination, retaliation, or interference suffered by Plaintiff, including, without limitation, by: processing or denying accommodation requests, providing job-duty or site-visit information used to deny accommodations, affirming accommodation denials, imposing or implementing leave, designating or threating AWOL, requiring a Section 72, revoking telework, forcing a return-to-work, or issuing disciplinary steps, or failing to correct the violations despite authority to do so.

553. Plaintiff suffered damages available under the NYSHRL as a result of the Individual Defendants' conduct.

554. Plaintiff is entitled to all relief available to him under the NYSHRL.

## FOURTEENTH CAUSE OF ACTION
**Failure to Accommodate Under NYCHRL**
**(By Plaintiff and the Permanent Disability Denial Class Against Defendant City)**
**(By Plaintiff Against All Individual Defendants)**

555. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

556. Plaintiff had and continues to have a disability under the NYCHRL, and he could satisfy the essential requisites of his job with the reasonable accommodation of full-time remote work and discrete site visits when assigned and medically feasible.

557. Defendants knew or should have known of Plaintiff's disability and accommodation need, and Plaintiff provided medical documentation supporting full-time remote work.

558. Defendants denied, restricted, delayed, and terminated Plaintiff's requested full-time remote work accommodation and failed to provide an effective alternative accommodation that allowed Plaintiff to work while complying with medically required treatment.

559. Defendant City maintained or applied policies, practices, customs, procedures, or standard operating procedures that treated permanent or no-end-date accommodation needs, forced leave, medical leave, FMLA leave, and unnecessary medical documentation as substitutes for individualized accommodation and/or a presumptive undue hardship, even where an accommodation would have allowed the employee to continue satisfying the essential requisites of the job.

560. Defendant City denied, restricted, delayed, terminated, or failed to continue Plaintiff's full-time remote-work accommodation, including, without limitation, based on generalized undue-hardship assertions, asserted site-visit barriers, and the permanent, long-term, indefinite, or no-end-date nature of the disability or requested accommodation.

561. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, but was told by DCAS that he needed to return to work "full duty" and/or "without restrictions" and has otherwise not been approved to return to work.

562. Plaintiff has alternatively requested to return to work in-person with in-person accommodations of his disability but has been prohibited from returning to work.

563. Plaintiff has requested a reasonable accommodation of fully remote work, with the exception of site visits, in order to return to work, or in the alternative, left with no other option, to return to work with an in-person accommodation, but was told by DCAS that he needed to return

to work "full duty" and/or "without restrictions," and has otherwise not been permitted to return to work.

564. Plaintiff also requested and was denied and/or not approved for the disability accommodation of priority assignment of project assignments that would have any required site visits near his home.

565. It was DCAS's policy, pattern and/or practice, and/or standard operating procedure to deny, in whole or in part, or not approve, in whole or in part, disability accommodation requests based on the permanent, long-term, unknown duration, and/or indefinite nature of the disability, and/or the permanent, long-term, and/or indefinite nature of the requested accommodation.

566. These acts violated the statutory rights of Plaintiff and the Permanent Disability Denial Class.

567. The Individual Defendants personally participated in, approved, implemented, ratified, or failed to correct the unlawful failure to accommodate Plaintiff through the conduct alleged above, and the failure to accommodate had an impact within New York City.

568. As a direct and proximate result of Defendants' failure to accommodate Plaintiff, Plaintiff suffered damages.

569. Plaintiff and the Permanent Disability Denial Class are entitled to class-wide declaratory and injunctive relief against Defendant City, and Plaintiff is entitled to all individual relief available under the NYCHRL against Defendants.

## FIFTEENTH CAUSE OF ACTION

**Failure to Engage in Cooperative Dialogue Under the NYCHRL**
**(By Plaintiff, the Medical Inquiry Class, and the Permanent Disability Denial Class Against Defendant City)**
**(By Plaintiff Against All Individual Defendants))**

570. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

571. Defendants were required to engage in a timely, individualized, and good-faith cooperative dialogue and to provide a written final determination to Plaintiff after reaching a final determination at the conclusion of that dialogue.

572. Defendants failed to conduct a good faith individualized assessment of Plaintiff's actual job duties, remote-work history, site-visit frequency, project assignments, medical limitations, and effective accommodation options.

573. Defendants relied on generalized assertions about duration, permanency, indefinite accommodations, site visits, operational need, and undue hardship rather than engaging in a cooperative dialogue directed to Plaintiff's actual limitations and work.

574. Defendants also failed to explain why a previously approved and successful accommodation could not continue, failed to identify an effective alternative, and denied Plaintiff accommodations without meaningful dialogue.

575. A good-faith cooperative dialogue required Defendants to test their "not necessary" rationale against Plaintiff's actual limitations and actual job duties.

576. The Individual Defendants personally participated in, approved, ratified, implemented, or failed to correct the cooperative-dialogue violations as alleged above in relation to Plaintiff's reasonable accommodation requests.

577. The Medical Inquiry Class and the Permanent Disability Denial Class were denied the required cooperative dialogue because, instead of a good faith cooperative dialogue evaluating their accommodation requests as objectively required by the NYCHRL, they were asked for and/or required to provide additional and/or unnecessary medical documentation.

578. As a direct and proximate result of Defendants' failure to engage in a cooperative dialogue with Plaintiff, Plaintiff suffered damages.

579. Plaintiff, the Medical Inquiry Class, and the Permanent Disability Denial Class are entitled to class-wide declaratory and injunctive relief against Defendant City, and Plaintiff is entitled to all individual relief available under the NYCHRL against Defendants.

## SIXTEENTH CAUSE OF ACTION
**Retaliation under NYCHRL**
**(By Plaintiff and the Remote Work Request Retaliation Class Against Defendant City)**
**(By Plaintiff Against All Individual Defendants)**

580. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

581. Plaintiff and the Remote Work Request Retaliation Class engaged in protected activity by, among other activity, requesting, renewing, supplementing, appealing, and opposing denials of disability-based accommodations.

582. Plaintiff also filed NYSDHR complaints, retained counsel, had counsel send correspondence asserting his disability rights, and commenced this action.

583. Defendants knew of that protected activity and took actions reasonably likely to deter a person from engaging in protected activity.

584. Those actions included, among others, Plaintiff's September 2022 demotion, the seventeen-minute denial of his May 19, 2025 accommodation request after the May 2025 NYSDHR retaliation complaint, forced leave usage, refusal to continue interim telework, AWOL

designation, revocation of leave and telework, Section 72 scheduling, involuntary FMLA or medical leave, automatic denial of later accommodation requests, repeatedly asking him to submit unnecessary and duplicative additional medical documents, false and pretextual disciplinary charges, denial of his requested June 25, 2025 foot disability accommodation, seeking termination through the charging process after this action was filed, and full-duty return demands.

585. Those actions also included DCAS's March 28, 2026, public-facing service of the disciplinary charges at Plaintiff's home, after the same charges had already been provided through multiple less intrusive channels, by taping the charges directly to Plaintiff's front door in plain view, photographing the papers, and leaving them exposed.

586. The causal connection is supported by temporal proximity and escalating adverse actions after protected activity.

587. The timing and manner of the March 28, 2026, home service further support animus and causation because it occurred twelve days after Plaintiff filed this federal lawsuit and after DCAS had already provided the same charges through multiple less intrusive methods. The unnecessary public exposure of charges containing serious disciplinary and criminal accusations was more than a petty slight or trivial inconvenience and was reasonably likely to deter a person from continuing protected activity under the NYCHRL.

588. Defendants' explanations for their actions were pretextual, shifting explanations, and contradicted by their own prior positions and documentation.

589. The Individual Defendants personally participated in, approved, ratified, implemented, or enforced the retaliatory acts alleged above, and the retaliation had an impact within New York City.

590. Defendant City retaliated against the Remote Work Request Retaliation Class by taking actions against them within seventy-five days after the request, renewal, supplement, or appeal of their disability-based remote work accommodation request.

591. Since, at least approximately September 1, 2022, it was the City's policy, pattern and/or practice, and/or standard operating procedure to retaliate against employees who requested disability-based remote work accommodations.

592. Since, at least approximately September 1, 2022, Defendant City further subjected Plaintiff and the Remote Work Request Retaliation Class to a retaliation based hostile work environment through conduct reasonably likely to deter protected activity. For Plaintiff, that hostile work environment included, without limitation, the September 2022 demotion, which removed him from the senior management team, placed him in a subordinate Project Manager role, and gave DCAS a later basis to pretextually contend that site visits barred full-time remote work

593. The retaliatory hostile work environment was more than petty slights or trivial inconveniences and was reasonably likely to deter employees from requesting or pursing disability-based remote work accommodations.

594. Retaliation against the Remote Work Request Retaliation Class was Defendant City's standard operating procedure.

595. These acts violated the statutory rights of the Remote Work Request Retaliation Class.

596. As a direct and proximate result of Defendants' retaliation, Plaintiff has suffered damages.

597. Plaintiff and the Remote Work Request Retaliation Class are entitled to class-wide declaratory and injunctive relief against Defendant City, and Plaintiff is entitled to all individual relief available under the NYCHRL against Defendants.

**SEVENTEENTH CAUSE OF ACTION**
**Coercion, Intimidation, Threat, Interference, and Attempted Coercion, Intimidation, Threat, and Interference Under NYCHRL**
**(By Plaintiff, the Permanent Disability Denial Class, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**
**(By Plaintiff Against All Individual Defendants)**

598. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

599. Plaintiff and the Classes exercised and sought to exercise rights protected by the NYCHRL, including, without limitation, rights to disability accommodations, cooperative dialogues, limited medical inquiries, and freedom from retaliation.

600. Defendant City and the Individual Defendants interfered with, coerced, intimidated, threatened, or attempted to interfere with Plaintiff and the Classes by, among other things, using unnecessary medical-document demands, duration-based denial rationales, forced leave, AWOL threats or designations, Section 72 processes, involuntary leave, discipline, bringing criminally framed charges, seeking the charge relief of termination after this case was filed, and full-duty return demands to pressure employees away from protected accommodation rights.

601. Defendants further interfered with and/or attempted to interfere with Plaintiff's NYCHRL rights by, among other things, using the pending disciplinary charges, the threat of termination or resignation, and the possibility of a materially more favorable disciplinary outcome to pressure Plaintiff to dismiss this lawsuit and return "as a normal employee" without his requested disability accommodation. This conduct coerced, intimidated, threatened, and interfered

with Plaintiff's exercise of a NYCHRL-protected accommodation, cooperative-dialogue, anti-retaliation, and litigation rights and/or attempted to do so.

602. Defendant City and Defendant Kazior further interfered with, coerced, intimidated, threatened, or attempted to interfere with Plaintiff's NYCHRL rights by communicating with Plaintiff during the accommodation process while Plaintiff reasonably understood Kazior to be a union-referred civil-service or accommodation resource, advising Plaintiff to obtain and submit additional medical documentation, and failing to disclose that Kazior was acting as DCAS counsel or that information Plaintiff provided could later be used by DCAS in connection with a Section 72 examination, forced leave, discipline, litigation, or other adverse action.

603. Defendant City and Defendant Kazior's conduct burdened and attempted to chill Plaintiff's exercise of NYCHRL-protected rights, including his rights to request and appeal reasonable accommodations, participate in cooperative dialogue, provide medical information only through a fair and transparent accommodation process, oppose disability discrimination and retaliation, and pursue administrative and judicial remedies without coercive or misleading agency involvement.

604. Defendants further interfered with and/or attempted to interfere with Plaintiff's NYCHRL rights by causing or permitting disciplinary charges that included serious disciplinary and criminal accusations to be taped directly to Plaintiff's front door in plain view, even though DCAS already had provided the same charges through multiple less intrusive channels. That method of service was unnecessary to provide notice and had the purpose or effect of intimidating Plaintiff, exposing him to embarrassment and reputational pressure, invading his privacy, and chilling his continued exercise of NYCHRL-protected accommodation, cooperative-dialogue, opposition, administrative-charge, and litigation rights.

605. Under all the existing circumstances, the conduct had a reasonable tendency to coerce or intimidate employees regardless of whether they are actually coerced.

606. Defendant City maintained or applied policies, practices, customs, procedures, or standard operating procedures that had the effect of chilling or burdening disability accommodation activity.

607. The Individual Defendants personally participated in the interference, coercion, intimidation, threats, or attempted interference alleged above, and their conduct had an impact within New York City.

608. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff suffered damages.

609. Plaintiff and the Classes are entitled to class-wide declaratory and injunctive relief against Defendant City, and Plaintiff is entitled to all individual relief available under the NYCHRL against Defendants.

**EIGHTEENTH CAUSE OF ACTION**
**Aiding, Abetting, Coercing, Inciting, Compelling, and/or Attempting to Do So Under NYCHRL**
**(By Plaintiff Against All Individual Defendants)**

610. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

611. Defendant City violated the NYCHRL by, among other things, discriminating and retaliating against Plaintiff because of his disability, accommodation requests, accommodation appeals, protected opposition, administrative filings, and this lawsuit.

612. As alleged above, each Individual Defendant was a person within the meaning of N.Y.C. Admin. Code § 8-107(6), knew of Plaintiff's disability and protected activity, and aided,

abetted, incited, compelled, or coerced Defendant City or each other's violations of the NYCHRL, or attempted to do so.

613. The Individual Defendants actually participated in the discrimination, retaliation, or interference suffered by Plaintiff, including, without limitation, by: processing or denying accommodation requests, providing job-duty or site-visit information used to deny accommodations, affirming accommodation denials, imposing or implementing leave, designating or threating AWOL, requiring a Section 72, revoking telework, forcing a return-to-work, issuing disciplinary steps, or failing to correct the violations despite authority to do so.

614. Upon information and belief, one or more Individual Defendants participated in, approved, directed, ratified, or failed to correct the March 28, 2026 method of serving the disciplinary charges at Plaintiff's home, including the decision to use a public-facing method of service after DCAS already had provided the same charges through multiple less intrusive channels.

615. Plaintiff suffered damages available under the NYCHRL as a result of the Individual Defendants' conduct.

616. Plaintiff is entitled to all individual relief available under the NYCHRL against Defendants.

## NINETEENTH CAUSE OF ACTION
**Disparate Impact Under NYCHRL**
**(By Plaintiff, the Permanent Disability Denial Class, the Remote Work Request Retaliation Class, and the Medical Inquiry Class Against Defendant City)**

617. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

618. In addition, or in the alternative, Defendant City maintained facially neutral policies, practices, customs, procedures, or standard operating procedures that disproportionately

harmed employees with disabilities, employees with permanent, long-term, chronic, indefinite, or no-end-date disabilities, and employees whose disabilities required remote work, compared with employees without such disabilities or accommodation needs.

619. The challenged practices included, without limitation, treating indefinite or permanent accommodation needs as presumptively unreasonable, applying Citywide telework or in-person rules as limits on disability accommodations, applying general medical documentation requirements for disability accommodations, using leave, FMLA, medical leave, Section 72, AWOL, or discipline as substitutes for accommodations, denying interim telework during review or appeal, and demanding unnecessary medical documentation.

620. Less discriminatory alternatives were available, including individualized assessment, interim telework during review or appeal, acceptance of sufficient existing documentation, periodic non-categorical review, and continuation of effective remote-work accommodations where the employee can satisfy the essential requisites of the job.

621. Defendant City failed to adopt those alternatives, and the disparate-impact violations had an impact within New York City.

622. As a direct and proximate result of Defendant City' discriminatory conduct, Plaintiff suffered damages.

623. Plaintiff and the Classes are entitled to class-wide declaratory and injunctive relief, and Plaintiff is entitled to all individual relief available under the NYCHRL.

## TWENTIETH CAUSE OF ACTION

**Disparate Treatment Disability Discrimination, Disability Stereotyping, and Disability-Based Hostile Work Environment Under NYCHRL**
**(By Plaintiff Against Defendant City)**
**(By Plaintiff Against All Individual Defendants)**

624. Plaintiff realleges and incorporates by reference all allegations in the preceding paragraphs.

625. Plaintiff had and continues to have a disability under the NYCHRL, Defendants knew or should have known of that disability, and Plaintiff could satisfy the essential requisites of his job with or without reasonable accommodation.

626. Defendants treated Plaintiff less well because of his disability by, among other things, denying, restricting, delaying, and terminating remote work, repeatedly demanding medical documentation, treating his continuing accommodation need as a reason to deny him accommodations, forcing leave, marking or threatening AWOL, revoking telework, using Section 72 or FMLA processes, restricting access, advancing discipline, and reframing accommodation issues as misconduct.

627. Defendants treated Plaintiff less well than non-disabled employees who received telework flexibility of two days of remote work a week while he was forced onto an involuntary leave and provided with no remote work days, while DCAS denied Plaintiff's requests for an accommodation for his permanent disability and/or disability accommodation.

628. Defendants engaged in disability stereotyping by treating Plaintiff's continuing need for remote work as incompatible with employment, as evidence that he was unfit, as a reason for medical examination or forced leave, or as a basis for discipline.

629. Defendants created, contributed to, or ratified a disability-based hostile work environment by, , among other acts, repeatedly forcing Plaintiff to choose between work and

medically required treatment, creating recurring uncertainty about his accommodation status, threatening leave or AWOL consequences, revoking telework, placing him in coerced medical or leave processes, restricting work access, and advancing discipline during the accommodation-related period.

630. Kazior's statement that Plaintiff must work "as a normal employee" further contributed to the disability-based hostile work environment because it stigmatized Plaintiff's accommodation need, framed him as abnormal because of his disability, and reinforced Defendants' continuing refusal to treat him as an employee entitled to equal terms and conditions with a reasonable accommodation.

631. The Individual Defendants personally participated in the discriminatory, stereotyping, and hostile-work-environment conduct alleged above, and the conduct had an impact within New York City.

632. As a direct and proximate result of Defendants' discriminatory conduct, Plaintiff suffered damages.

633. Plaintiff is entitled to all individual relief available against Defendants under the NYCHRL.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff individually, and on behalf of each of the Classes, respectfully requests that this Court enter judgment in his favor and against Defendants, and grant the following relief:

A. An Order certifying the proposed Classes pursuant to Fed. R. Civ. P. 23, appointing Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel pursuant to Rule 23;

B. Class-wide declaratory judgment, on behalf of Plaintiff and the Classes, declaring the acts complained of herein are in violation of the Rehabilitation Act, ADA, the FMLA, the NYSHRL, and NYCHRL, and that Defendant City is liable for these violations;

C. Class-wide injunctive relief requiring Defendant City to cease the challenged policies and practices and to implement lawful, timely, individualized accommodation procedures, including, but not limited to, an injunction: (1) prohibiting Defendant City from treating the long-term, permanent, chronic, indefinite, or open-ended nature of a disability or accommodation need as automatically disqualifying without individualized assessment; (2) requiring Defendant City to evaluate remote-work and other accommodation requests through an individualized assessment of the employee's limitations, the effectiveness of the requested accommodation, the essential functions of the position, available effective alternatives, and undue hardship; (3) prohibiting blanket rules or presumptions against accommodations because they are characterized as "permanent," "indefinite," "indeterminate," or lacking a fixed end date; and (4) limiting requests for updated medical documentation to information reasonably necessary to evaluate disability, functional limitations, or accommodation need, and only where Defendant City does not already possess sufficient information; (5) requiring the creation and funding of an independent office and/or ombudsman to prospectively objectively evaluate all disability accommodation requests from DCAS employees; (6) reclassifying time unlawfully categorized as an unauthorized absence and/or AWOL as a protected authorized absence under applicable law; (7) requiring Defendant City to identify class members whose accommodation requests, return-to-work status, or employment records were affected by the challenged policies, and to correct adverse personnel records caused by the challenged policies; and (8) prohibiting retaliation against employees who request disability-based remote work accommodations;

D. As to Plaintiff individually: equitable and injunctive relief including reinstatement to active, paid employment in his current or pre-demotion position or an equivalent role, restoration of work and system access, grant of full-time remote work with medically feasible site visits, or a treatment-compatible accommodation, suspension of any full-duty, no-restrictions, or 100 percent healed return requirement, equal access to ordinary telework, restoration of pay, leave, benefits, health insurance, service credit, civil-service status, and employment status, removal of AWOL records, restoration of depleted leave banks, and prohibition of discipline including to the extent used to interfere with Plaintiff's accommodation rights or protected activity or to prosecute his termination or criminally framed charges;

E. As to Plaintiff individually: back pay, front pay, nominal damages, compensatory damages, emotional distress damages, liquidated damages, actual damages, and all other available relief to which he is entitled;

F. As to Plaintiff individually: injunctive relief enjoining Defendant from prosecuting its retaliatory charges or conditioning the withdrawal, mitigation, or resolution of disciplinary charges on Plaintiff's dismissal of this lawsuit or abandonment of his disability-accommodation position;

G. An award of reasonable attorneys' fees, expert fees, costs, and pre-judgment and post-judgment interest; and

H. Such other and further relief as the Court deems necessary, just, and proper.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

Dated: June 12, 2026
Long Island City, New York

Respectfully submitted,

By: /s/ Cyrus E. Dugger
Cyrus E. Dugger

**THE DUGGER LAW FIRM, PLLC**
28-07 Jackson Ave., 5th Fl.
Long Island City, New York 11101
Tel: (646) 560-3208
Fax: (646) 390-4524
cd@theduggerlawfirm.com

***Attorneys for Plaintiff Drilon Berdynaj and the Putative Classes***